THE VULCAN DETINNING COMPANY, Appellant, *v.* FRANZ A. ASSMANN and Others, Respondents.

First Department, December 20, 1918.

Fraud — presumption against — evidence — testimony of hostile witness — injunction — suit to restrain use of chlorine process of detinning perfected by plaintiff — trade secrets — evidence — right of master to information acquired by employee — processes entitled to protection as trade secrets — right to keep knowledge of methods of installation secret — rule that one seeking equitable relief must come into court with clean hands — appeal — right of defendant to new trial after submission of case for final decision on merits.

The rule, that where evidence is capable of an interpretation making it equally consistent either with the absence or presence of a wrongful act, that meaning must be ascribed to it which accords with its absence, loses much of its force when it is discovered that the parties sought to be charged have been guilty of similar frauds.

A plaintiff is not necessarily bound by the testimony of a hostile witness, if it is demonstrated to be erroneous by the weight of other evidence in the case.

In a suit by a detinning company, operating under a secret process of chlorine detinning which it had successfully developed after years of effort, to procure an injunction against another company, and also individuals, it was alleged that the defendant company had procured the plaintiff's process, methods of installation, trade secrets and apparatus through a breach of trust by the plaintiff's former vice-president and manager, and

through the violation of an express contract by a chemist while they were both in the plaintiff's employ. Evidence examined, and

*Held*, that there is no basis for plaintiff's claim that its former manager intending if the process being developed by the plaintiff proved to be a success to employ it in a rival organization which should take title to certain existing patents, induced the plaintiff to take out a license of said patents so that it would appear that both companies were operating under the same patented process;

That no one could take said patents which had merely produced laboratory results and operate a detinning plant commercially;

That the plaintiff through the efforts of its former manager and other employees actually devised a secret process through which ·chlorine detinning could be successfully carried on commercially;

That it was honestly believed by the plaintiff, its former general manager and the experts and by plaintiff's patent solicitors that its process did not infringe any existing patents.

While the plaintiff's general manager was in its employ, it alone was entitled to information as to the most feasible methods of operating the detinning process.

Neither processes of manufacture nor machinery nor machinery installation need be patented in order to be protected as trade secrets.

Whether or not the plaintiff's process of detinning in so far as it solved the problem of temperature control was a secret process within the ordinary meaning of that term, and whether or not it was covered or dominated by existing patents, the plaintiff was entitled to keep the knowledge of its peculiar methods of installation to itself, and is entitled to the aid of a court of equity to have such installation protected as a trade secret.

Irrespective of the technical question involved as to identity of process, the plaintiff made out a *prima facie* case, entitling it to an injunction restraining the defendant corporation from operating its chlorine detinning plant, from employing there or elsewhere in the process the methods of installation devised and developed by the plaintiff, information concerning which was obtained through betrayal of confidential information by plaintiff's former manager.

The plaintiff's contention that it had devised a secret process of chlorine detinning which was not dependent for its success upon temperature control, and that its former manager betrayed this secret to the defendant corporation which was using it under the guise of operating under existing patents, is unproved.

The plaintiff having reason to believe that the defendant corporation had largely copied its installation from information divulged by its former manager is not deprived of equitable relief by the fact that it sent a representative into the defendant's plant, not for the purpose of copying its devices, but for the purpose of establishing that its own processes had been copied.

But if it were established that the plaintiff had sent a spy into the works of the defendant corporation to obtain information for use in its business,

it would be denied equitable relief upon the ground that it has not come into court with clean hands.

The defendants by asking for a dismissal on the merits at the close of the plaintiff's case cannot be said, under the circumstances, to have submitted the case for final decision, in the event that their motion was denied, so as to authorize the Appellate Division upon a reversal of the judgment to grant appropriate relief, without ordering a new trial, although the defendants have not put in their case except in so far as it developed upon the cross-examination.

APPEAL by the plaintiff, The Vulcan Detinning Company, from a judgment of the Supreme Court in favor of the defendants, entered in the office of the clerk of the county of New York on the 5th day of February, 1916, dismissing the complaint on the merits upon the decision of the court after a trial at the New York Special Term, the motion to dismiss having been made and taken under advisement at the close of plaintiff's case.

*Nathan L. Miller* of counsel [*Henry Wollman, Edward S. Seidman* and *W. H. Milholland* with him on the brief; *Wollman & Wollman*, attorneys], for the appellant.

*Austen G. Fox* of counsel [*George W. Alger* and *Richard Steel* with him on the brief; *Kidder, Ayres & Riggs*, attorneys], for the respondents Franz A. Assmann and others.

*Felix H. Levy*, attorney for respondents Clara Kern and Henry Kern, as executors, etc.

SHEARN, J.:

The gravamen of the complaint is that the Republic Chemical Company, Inc., appropriated a secret process of chlorine detinning which the plaintiff, the Vulcan Detinning Company, had successfully developed after years of effort and by the expenditure of large sums of money; that the Republic Company substantially duplicated the complicated and novel installation which the plaintiff had devised for the practical working of the process; that it procured and used plaintiff's trade secrets, especially its list of customers from whom it purchased tin scrap, and the knowledge which it obtained, by

First Department, December, 1918.    [Vol. 185.

careful analysis, of the most desirable scrap for detinning purposes, and that it even went so far as to obtain drawings for apparatus belonging to the plaintiff; and that the process, installation, trade secrets and apparatus were so procured through a breach of trust by the defendant Adolph Kern while he had control and management of the plaintiff, and through the violation of an express contract by the defendant Dorris Whipple while the latter was still in plaintiff's employ under an express contract to hold the knowledge, which he thereby obtained, in trust for it.

The foundation of the case is Kern's breach of trust and his confederating with the defendant Franz A. Assmann, *while still in plaintiff's employ,* to establish the Republic Company in the chlorine detinning business as a rival of plaintiff and enable it to compete with the plaintiff in the business of chlorine detinning by the use of a certain alleged secret process in combination with devices and methods discovered, tested out and proved by experiment to be necessary in order to detin successfully upon a commercial scale.

As might be expected, the evidence to establish Kern's breach of trust is in large part circumstantial. This was stressed somewhat by the learned trial justice, who said: " In determining the weight to be given to the circumstantial evidence where it is sought to establish the fraudulent act by that sort of proof, the court will follow the well established rule referred to in the case of *Lopez* v. *Campbell* (163 N. Y. 340, at p. 347): ' Where the evidence is capable of an interpretation which makes it equally consistent ·with the absence as with the presence of a wrongful act, that meaning must be ascribed to it which accords with its absence.' " This presumption against fraud loses much of its force when it is discovered that the parties sought to be charged have been guilty of similar frauds. Therefore, it will help to ascertain at the start whether Kern and Assmann were the kind of men who would stoop to such misconduct as is charged. The answer is readily found in the very able opinion of Judge GARRISON in *Vulcan Detinning Company* v. *American Can Co.* (72 N. J. Eq. 387), an opinion well worth careful study, not merely for its bearing upon the point just referred to, but for its illuminating discussion of the principles applicable

to such a case as this. It was established in that case that the defendant Kern had not hesitated to procure and operate under a stolen process for electrolytic detinning and that Assmann, who was associated with him in the enterprise, had subsequently violated his trust to corporations of which he was a director by appropriating for his American Can Company a secret process employed by those companies. This decision is also important in that it brought home notice to Kern and Assmann that such conduct as was proved against them in the present case was not only wrong but illegal.

Kern's relation to the plaintiff, from the time of its organization until he sold his stock and left the employment of the plaintiff in September 1912, was a dominating one. He was not only its vice-president and general manager but was a director and a member of the executive committee, and during a part of the time was also its treasurer and assistant secretary. He received a large salary, which, with Christmas donations, amounted to about $25,000 a year. The record makes it clear that he was in touch with and practically familiar with every detail of plaintiff's process and business, and that his judgment guided the company. Kern was under contract with plaintiff as general manager and under his original contract of April 23, 1898, which was renewed yearly, he was compelled to abstain for a period of fifty years from manufacturing and dealing in tin scrap and from any connection with or interest in the tin scrap business. On March 25, 1909, Kern, by refusing to renew his contract otherwise, procured the plaintiff's board of directors to release him from the abstention clause of the contract. Coincident therewith Kern reported that he was investigating the subject of chlorine detinning. The complaint charges, and it is argued, that this change in his contract was the first step in a plan that he had then formed to develop the chlorine process at plaintiff's expense, and, when it was a success, set up the process with a rival company. This is surmise and the conclusion has no substantial basis. Kern had no means whatever of knowing early in 1909 that the chlorine process could be successfully developed. In releasing Kern from the abstention clause, however, plaintiff was careful to provide that the release " does not in any manner permit them [Adolph Kern and his

First Department, December, 1918.          [Vol. 185.

brother Henry Kern] to divulge the process, secrets, or inventions which they sold to the Vulcan Metal Refining Company, and which they or either of them may have obtained by reason of their connection or association with the said Vulcan Metal Refining Company or the Vulcan Detinning Company." Kern's contract of employment also provided that he should " devote his time, best efforts and skill to the promotion, benefit and welfare of the party of the first part."

Prior to the year 1909 plaintiff had been engaged in detinning scrap by the electrolytic process. This was operated by inserting a quantity of tin scrap, packed in perforated steel baskets, into a bath of alkali, usually caustic soda, and applying a current of electricity to the bath by which operation the tin on the tin plate was oxidized, separated from the tin plate and deposited against the cathods used in the process. The products were detinned scrap and an impure tin oxide in the shape of a powder called tin powder.

Chlorine detinning is the method which is involved in this action. Instead of obtaining tin oxide, this process produces tetrachloride of tin and detinned steel scrap. Tetrachloride of tin is used by manufacturers of silk for the purpose of weighting it. Its value is much greater than tin oxide.

Prior to 1909 Kern had learned that the Goldschmidts, in Essen, Germany, had replaced their equipment for electrolytic detinning with chlorine apparatus, and in 1909 he learned that they intended to build and operate a chlorine detinning plant in the United States. The Goldschmidts, operating under their own patents, made a great success of their process and solved a problem which chemists had been working on for fifty years without success.

On May 27, 1909, Kern reported these facts to plaintiff's board of directors with his opinion " that it is absolutely necessary for this company to install chlorine detinning to enable it to successfully compete with the Goldschmidt Detinning Company after the same begins operations." Kern was authorized to investigate chlorine detinning and patents and to employ a chemist familiar with chlorine. On July 26, 1909, C. F. Carrier, Jr., was engaged as chemist for one year from August 1, 1909. His contract vested all his inventions in the Vulcan Company and he was specifically employed

to use his efforts to the improvement of plaintiff's processes and the discovery of new processes. About this time the defendant Dorris Whipple, an expert chemist and a professor at Columbia University, was also employed by plaintiff to make a special report on the present state of the art of chlorine detinning, both in manufacture and theory, " together with a close study of existing patents and all the available discussions in the various patent suits " and " to make suggestions to us regarding the installation of a chlorine detinning plant and which in your opinion will not infringe upon existing patents." By the end of August an experimental plant and commercial laboratory had been installed at plaintiff's plant and Carrier went to work. To handle the engineering problems involved, a contract was entered into with John G. Walker on July 16, 1909, and, as in the case of the Carrier contract, and in fact all of the important contracts, the employee expressly. agreed that the processes and methods of detinning and all processes and improvements on processes, appliances and patents should be the sole property of the plaintiff and that all knowledge and information which he might acquire as to the processes and plants and methods belonged to the plaintiff and " that said processes, methods and appliances are secret and are kept secret by said Company, and that he does and will for all time hold such knowledge and information as he now has, or shall hereafter acquire with reference to said processes, methods, appliances, patents and plants, together with all improvements, as a secret and as trustee for the company." It was also the practice of the plaintiff to keep what was called a secrecy book in which all of its employees were required to sign a pledge of secrecy with respect to its processes, appliances and methods.

By October 20, 1909, Carrier began to report on his experiments, and for more than two years thereafter worked indefatigably in bringing his experiments to a successful issue. The record is replete with letters, reports and conferences passing between Carrier and Kern, giving a vivid and minute description of the innumerable difficulties encountered, and describing the experiments and improvements that finally ended in a successful, workable, commercial process. Kern was in touch with every step, frequently made important

criticisms and suggestions and possessed himself of every particle of information concerning the work as it developed.

Chlorine detinning, *i. e.*, the separation by chlorine of tin plate scrap into its component parts and recovering its steel or iron for remelting and its tin as a chloride, is based upon the facts, known for more than half a century as shown by numerous patents, that dry chlorine will remove tin from iron and that at a low temperature dry chlorine does not combine with iron. The inherent difficulties in chlorine detinning arise from the dual nature of tin·scrap, the intimate contract between its constituent parts, its finely divided form, the relatively large surface thus exposed, the chemical affinity which chlorine has for both tin and iron and the heat created by the reaction of tin with chlorine. While chlorine will react freely with tin at lower temperatures than that at which ·it combines with iron, the heat of formation of stannic chloride is intense, and unless quickly carried away from the surfaces of the tin scrap, the chlorine will combine with and set fire to the iron, defeating the very object of detinning. To· strip tin from tin plate without reaching the danger point of burning the iron was what proved to be, up to the advent of the Goldschmidts, an insuperable difficulty in the production of anhydrous tetra by chlorine detinning on a commercial scale. Thus temperature control was the basic element of the problem.

The Goldschmidts solved the problem by compressing the scrap into compact billets and subjecting these billets in a closed vessel to the action of chlorine and varying the pressure in the vessel during the detinning. This patent closed the field to any one who achieved the result by compressing the scrap into billets. The problem was, therefore, to get the same result without resorting to the device of compressing the scrap into small bundles or billets before subjecting it to the gas. Patents were issued for such a process in 1907 and 1909 to Franz Von Kugelgen and George O. Seward who had established a purely experimental plant at Holcombs Rock, Va., and with these patents we are concerned. By application filed January 16, 1904, patent No. 915,029 was issued March 9, 1909. In patent No. 915,029 they set forth their invention in five claims, which constituted little more

than a statement of the problem itself. The only suggestion as to method of controlling temperature was the following: " The temperature may be kept down either by cooling the vessel or by sufficiently limiting the amount of chlorin which enters the vessel."

A patentable invention must disclose the manner or process by which the end is accomplished. (*O'Reilly* v. *Morse,* 15 How. [U. S.] 62.) But we are not concerned with and have no right to pass upon the validity of these patents. They have been duly issued and so far as this court is concerned the Von Kugelgen and Seward patent No. 915,029 establishes as their invention and protects them and their licensees in the process of recovering tin from tin scrap " by treating the latter in a closed vessel with dry chlorin to form stannic chlorid, maintaining the temperature sufficiently high to effect complete detinning and controlling the temperature to keep it below that at which the iron is attacked."

Obviously, therefore, Carrier's problem was a difficult and apparently an impossible one. Temperature control was the basic element of any successful chlorine detinning, yet any device for controlling the temperature to effect detinning would fall within the Seward temperature control patents.

How this difficulty was surmounted is not precisely stated by any witness or clearly shown by any exhibit. It is quite apparent, however, how plaintiff and its experts believed that they had gotten around the difficulty. It appears that they arrived at the opinion and belief, fortified by the opinion of plaintiff's patent solicitors Briesen & Knauth, that, so long as there were no " special devices for regulating temperatures in the apparatus, or peculiar additions of gases, for instance, stannic chloride vapors," there would be no infringement of these temperature control patents. In other words, if the plaintiff discovered that the mere relation of the rate of flow of chlorine to the size of the charge of scrap to be detinned in a given period of time produced complete detinning without burning the iron, the temperature would be shown to be under control, but entirely without any *device* for maintaining or regulating it. Upon this basis Carrier proceeded.

The second serious element in the problem was to devise a plant that would detin successfully on a commercial basis.

Every one must recognize the vast difference between this and a successful laboratory experiment where, as stated in the Von Kugelgen and Seward application of August 4, 1905, in connection with their naive admission that " It is impossible to lay down any definite limits of proportion for the successful practice of our invention " that " with a chamber of 40 cubic feet capacity, a charge of 150 pounds of tin scrap has given successful results." The plaintiff was planning for a capacity of eighty tons a day and, of course, the planning and assembling of a plant that would do this successfully day in and day out was a problem of the first magnitude.

On April 21, 1910, Carrier reported: " The chlorine detinning will be ready to go ahead now in a very short time. I believe we now have all the necessary data but we have not had enough perfectly clean runs to give you the confidence which is essential to strike out into the new field. * * * The last experiment gave excellent results and the temperature was under perfect control." On April 29, 1910, Carrier wrote of experiment No. 18: " The scrap came out in beautiful condition." On October 4, 1910, Kern wrote Carrier to start up the plant and to continue to run it " as I desire to demonstrate whether the operation of a plant on a larger scale can be expected to be continuous and without drawbacks." On October 27, 1910, Carrier reported: " It seems to me that we have all the information necessary for proceeding to a consideration of plans for the future * * *. I trust you will permit me to go ahead with the estimates and specifications." On November 18, 1910, Carrier wrote: " I will continue the preparation of the drawings and specifications as you suggest in order to have them ready when needed." Carrier had now achieved an excellent measure of success with his experimental plant and the plaintiff was face to face with deciding whether to construct a big commercial plant along the lines of the process worked out by Carrier. It determined to go ahead, and on January 16, 1911, Whipple, who had done considerable investigation and other work for the plaintiff connected with the enterprise, was engaged " in a consulting and advisory capacity for chemical and engineering work and in relation to patents for two years." On February 28, 1911, Carrier rendered to the plaintiff a special report on the process

devised and on May 15, 1911, after obtaining from their patent solicitors a detailed criticism of Carrier's report, the plaintiff's board of directors authorized a plant, which should consist of one full sized cylinder with space for the addition of five more. This was proposed for the purpose of prosecuting " these experiments on a larger scale as nearly as possible approximating the operations of the actual plant when completed." By June 29, 1911, the drawings and specifications of the larger experimental plant were completed and this larger experimental plant was about completed by the middle of October, 1911. On October 19, 1911, the first experimental run in the large cylinder was started. While run No. 3, started November 17, 1911, ending November 22, 1911, was not a perfect success, as a hot spot was formed, the evidence makes it entirely apparent that by this time, if not before, Kern was well satisfied that a successful process had been devised. Indeed, on run No. 5, which started December 20, 1911, and ended December 28, 1911, the detinning was perfect.

Notwithstanding the belief of plaintiff, its experts and patent solicitors that so long as the Vulcan Company did not control temperature by active means or devices its process was not an infringement upon the Seward patents, it was recognized that its process was subject to attack in the courts. Accordingly, plaintiff had long under consideration the matter of acquiring the Seward patents. The matter was initiated as early as April 26, 1910, when Seward wrote to Kern. Nothing was done about the matter for some time. One reason was that the Goldschmidt Detinning Company was prosecuting in the Patent Office a claim that the Seward patents interfered with its process, a proceeding which was subsequently decided in favor of Seward and Von Kugelgen. Thereupon the plaintiff sent Whipple to Holcomb Rock, where he was permitted to inspect Von Kugelgen and Seward's experimental plant. On April 23, 1911, plaintiff received a letter from its patent solicitors, which concluded: " An alliance with the Goldschmidt interests is the obvious solution of all problems which confront you. If you can bring this alliance about by acquiring the Kugelgen patents for a reasonable figure, that would seem to be worth doing. The acquisi-

tion of the Kugelgen patents for their own sake does not appear to be desirable." Kern replied stating that he expected a report from Whipple in a few days. Whipple's written report on his inspection of the Von Kugelgen and Seward experimental plant is not in evidence, but was testified to by Kern, who was called by plaintiff as a witness. Kern was of course a hostile witness and plaintiff is not necessarily bound by his testimony if it is demonstrated to be erroneous by the weight of other evidence in the case. According to Kern, Whipple stated that he had come to the conclusion that Von Kugelgen and Seward dominated the chlorine detinning situation; that the experimental plant of the Vulcan at Sewaren was almost identical with the one that Von Kugelgen and Seward had at Holcomb Rock; that the process which Carrier had devised clearly infringed in many points upon the patents and the applications of Von Kugelgen and Seward, which were then in his hands; and that he feared very much that the patent would not be granted to the Vulcan Company.

To make this situation clearer, it should be stated that on April 22, 1909, Von Kugelgen and Seward had filed another application for a patent which was finally issued to them on February 10, 1914, No. 1,086,921. This was a patent for what is known as an operation in " series " and involved a material advance upon their other applications. In examining this patent, it appears that for the first time they disclosed in very considerable detail the methods by which they claimed to maintain and control the temperature and the various steps in the process. After referring to their process as set forth in patent No. 915,029, and stating that " The process is preferably practiced in a manner set forth in Letters Patent No. 853,461, granted May 14, 1907," they state:

" According to our present invention we render the process practically continuous by employing a series of tanks or vessels which are connected to form a circuit and are operated in succession. The operation is divided up into suitable units of time; say for example of one hour or more each, depending upon the size of the tanks, the amount of tin scrap therein, the strength of the chlorin, and the rate of flow of the chlorin. During each time-unit one of the tanks will ordinarily be cut out of the series, being opened for the removal of the iron scrap

and the recharging with tin scrap to be detinned. The remaining tanks are so connected that air is being admitted to the one which has been longest charged and the scrap in which has been completely detinned; the next tank in the series receives fresh dry chlorin gas together with the air passing from the preceding tank and carrying the chlorin which it has displaced therefrom; in each successive tank the mixture of chlorin and air encounters a fresher or newer charge of tin scrap with the tin on which the chlorin combines to form stannic chlorid, until in the last tank of the series the chlorin has all or practically all been removed from the air, whereupon the air which remains is drawn out by any suitable suction device such as a pump or ejector."

The significance of this becomes apparent when one carefully reads Carrier's report on the Vulcan three-cycle process which he had devised, embodied in Exhibit D-83. From this exhibit it appears that Carrier, working independently and, so far as the evidence shows, without any knowledge whatever of the Seward series process application, had evolved a process of operation in *series*, employing a method which seems (of course it is not for us to decide) to be such an improvement upon and so different from the single cylinder process involved in other patents as to constitute a real invention. Pointing out in his report that if a process were devised in which a temperature " high enough to produce the reaction between dry chlorine and iron does not exist, or cannot be attained," no temperature control, water cooling or other device for temperature control would be necessary, Carrier says: " It will now be shown that in the Vulcan process as described, it will be utterly impossible to ever raise the temperature to the point where the chlorine would begin to attack the iron."

It appears that Carrier relied strongly in obtaining his results upon operating a number of cylinders in series, so connected by piping that chlorine gas could be admitted from any one cylinder to any other of a series of six, and each one having a gas outlet into a common pipe, running over them all and through a pressure apparatus, from which pressure apparatus the gas which had passed through and escaped from the various cylinders might by a further system of piping be

First Department, December, 1918.    [Vol. 185.

again admitted to any one or to all of the cylinders, thus being used over and over again. This enabled the operation to be started with a weak instead of a strong chlorine gas, which readily attacks the fresh charge of tin, and then to follow up and complete the operation by admitting stronger gas. This idea was not only calculated to keep the temperature at all times below the point at which the chlorine would attack the iron but to increase greatly the capacity of the plant and speed of operation, through ability to use the gas which had been weakened in one cylinder for the first attack on fresh tin in another connected cylinder.

Now it appears that Carrier had filed an application for a patent. It also appears that applications of Carrier's were in interference with Von Kugelgen and Seward applications, and that Carrier failed to get a patent. For some reason this enormous record, containing hundreds of pages of irrelevant testimony, does not contain the Carrier applications and does not disclose definitely which claims of Von Kugelgen and Seward were in interference with Carrier's applications. It is maintained on behalf of the plaintiff that the Carrier application, which was in interference with Von Kugelgen and Seward and decided in favor of the latter, was not the series process embodied in Exhibit D-83 (Carrier's report on the Vulcan process). The object of this is to show that the Vulcan process, as put into operation, does not embody the invention covered by any one of the three Von Kugelgen and Seward patents, for, as will later appear, the Republic Company acquired and operates under Von Kugelgen and Seward patents. Accordingly, if it appeared that the Patent Office had decided that Carrier's process, embodied in Exhibit D-83, and as described in his application for a patent, interfered with Von Kugelgen and Seward's application which resulted in the issue of patent No. 1,086,921, it would be persuasive evidence that both the Vulcan Company and the Republic Company were using processes which, if not identical, were both within the allowed claims of the Von Kugelgen and Seward patents.

I think that the evidence strongly tends to show that this was the case. The only pending application that Von Kugelgen and Seward had, so far as the evidence shows,

during the period of Carrier's experiments was the one filed April 22, 1909, which ripened into patent No. 1,086,921 on February 10, 1914. Carrier's report, Exhibit D-83, was dated February 28, 1911, and it was in the spring of 1911 that Whipple examined the Seward and Von Kugelgen plant and data, which led to his report, as testified to by Kern, that the Von Kugelgen and Seward application anticipated the process devised by Carrier. When it is found that the plaintiff adopted a series process devised by Carrier, and when the process actually in use by plaintiff as described by its president Buttfield, is compared with the process employed by the Republic Company, as described by Kern and more particularly by the Republic Company's vice-president, Mr. Ayres, and also considering the fact that the plaintiff failed to put the Carrier applications in evidence, one is led to the conclusion that the Carrier application which interfered with the already anticipated process of Von Kugelgen and Seward was the process embodied in Carrier's report D-83 and actually installed. This is fortified by what occurred after Whipple's report was received in April, 1911. After refusing for a year to spend any money in acquiring what were considered to be doubtful rights from Von Kugelgen and Seward, Whipple's report was turned over to plaintiff's patent solicitors who wrote on May 10, 1911: " We are wholly unable to anticipate the course of this pending Kugelgen application in the Patent Office, but you should bear in mind that there is a possibility, and we are inclined to think a likelihood, that a patent will issue on that application. * * * The acquisition of a license under the Kugelgen patents for a reasonable sum, not exceeding say $10,000 would probably be cheaper than litigation, and if the profits of the process warrant it, a license acquired on those terms might be advisable." On August 2, 1911, Kern on behalf of the plaintiff offered Seward $25,000 for the patents. Seward replied with an offer of a non-exclusive license, not to exceed seventy-five tons a day for $25,000, and in addition a royalty of fifty cents a ton for scrap. Finally, after more negotiations, the license agreement was executed on November 2, 1911.

This evidence satisfies me that there is no basis for plaintiff's claim that Kern, intending from the start, if the process

proved to be a success, to employ it in a rival organization which should take title to the Von Kugelgen and Seward patents, induced the plaintiff to take out this license so that it would appear that both companies were operating under the same patented process, one under a license and the other as owner. I think it is also clear from the evidence reviewed, (1) that no one could take the original Von Kugelgen and Seward patents, which had merely produced what may be called laboratory results, and operate a detinning plant commercially by any means disclosed or suggested in those patents; (2) that the plaintiff through the efforts of Carrier, assisted by the advice of the engineer, Walker, Kern and Whipple, actually devised a secret process through which chlorine detinning could be successfully carried on commercially; (3) that this process was susceptible of operation either in a single cylinder system or in a series of cylinders operating as a unit in any two cylinders operating as a unit; (4) that it was honestly believed by the plaintiff, Kern, the experts and by plaintiff's patent solicitors that plaintiff's process as thus devised did not infringe any existing patent; and (5) that when the process was disclosed in Carrier's applications it was held in the Patent Office that Von Kugelgen and Seward had anticipated Carrier's invention.

Whether the plaintiff's process infringed the Von Kugelgen and Seward patents it is not for us to decide. We are merely concerned, on this branch of the case, with the question whether or not the processes are so similar in principle as to support a finding, not in a patent infringement suit but in an unfair competition suit such as this, that they are both covered by the same patented process. It is to be remembered that one of the charges is that the Republic Company, through Kern's betrayal of trust, acquired the plaintiff's *process.* If, however, the two processes are covered by the same patent, and the Republic Company owns the patent, it is not contended that the Republic Company be enjoined from using a process covered by its own patent, even if it was led to acquire the patent by disclosures wrongfully made to it by Kern. While this discussion of the significance of plaintiff's acquiring a license under the Von Kugelgen and Seward patents has thus involved a considerable survey of

the question of process, I do not at this time intend to dispose definitely of the question whether the two processes are not only substantially identical but both covered by the same patents, for this does not appear to be the appropriate place to do so.

We now have before us the situation as existing in the middle of November, 1911, when it was apparent that the plaintiff had succeeded in devising a process for chlorine detinning on a large commercial scale as a result of these long and very expensive experiments, and had fortified itself against attack by taking out a license under the only patents that it feared. It was at this time and under these circumstances that Kern set out to undermine the plaintiff and build up a rival, employing the knowledge that he had obtained through the plaintiff's experimentation.

There now followed a course of conduct on the part of Kern, in association with Franz A. Assmann, which, for disloyalty to Kern's employer and betrayal of trust, is even more aggravated than the somewhat parallel proceedings disclosed in the case of *Vulcan Detinning Company* v. *American Can Co. (supra)*. Between November 11, 1911, and November 17, 1911, when Kern undoubtedly had reached the well-warranted conclusion that the Vulcan Company's process was a success and that it was closely identified with, if not controlled, by the Seward and Von Kugelgen patents, Kern met Seward and obtained for himself an option on the Von Kugelgen and Seward patents for ten per cent of the stock of any company that might be formed. They discussed the probable cost of installation, $160,000 to $170,000; working capital, $70,000 or $80,000 — to cover which $250,000 in cash would be contributed. How much earlier Kern sought out Assmann does not appear, but it does appear that he went to Assmann to enlist him in establishing a chlorine detinning company, and between November 12 and November 17, 1911, told Assmann that the Von Kugelgen and Seward patents were in the market; that it was to the interest of Assmann and the Continental Can Company (with which Assmann was connected) to buy these patents and start a detinning plant; that he intended to sever his connection with the Vulcan Company; that the owners of the patents would have to be paid forty-nine per

cent of the stock of the projected company and that he had an option on the patents. Kern told Assmann that the Vulcan Company had taken a license under these patents but Assmann, called as a witness by the plaintiff, did not remember Kern saying that the Vulcan Company had done any experimenting. The record does not leave a shadow of doubt that Kern told Assmann all about the Vulcan experiments and their successful issue. It is impossible to believe that shrewd business men would have put $250,000 cash into a new business, to be conducted under a process patent, on Kern's mere impression that the inventors had succeeded in detinning 300 tons of scrap in an experimental plant. Assmann took up the matter with Cranwell, president of the Continental Can Company, and on November 17, 1911, one of their business associates, Edwin Norton, wrote to Sturdevant and Mason, patent lawyers in Washington, regarding the Von Kugelgen and Seward patents. On December 30, 1911, Sturdevant and Mason made their report to the effect that the Von Kugelgen and Seward patents were valid and "that the interferences in which the Von Kugelgen & Seward applications are concerned will probably terminate favorably to them." On January 1, 1912, Sturdevant and Mason's report having been received by Assmann, he telephoned Kern to come to his house, where they discussed the proposition. On the following day Assmann wrote to Norton: "We have decided to go ahead. * * * It looks to me that this is a gold mine." The same day Kern was with Assmann at the latter's office, 25 Broad street, and discussed the matter of incorporating the new company with Assmann's attorney, Mr. Ayres. On January 3, 1912, Assmann wrote the defendant Muench, who was engaged to take charge of installing the Republic plant. On January 11, 1912, Kern, Assmann, Seward, Muench, Ayres and others held a meeting in Assmann's office. It will be noted that the Vulcan Company's run No. 5 in which the tin was "perfect" ended December 28, 1911. On January 15, 1912, Seward wrote Kern confirming his agreement to pay Kern a commission of $645,000 for negotiating the sale of the patents to the Republic Company by paying $175,000 preferred stock and $470,000 common stock of the Republic Company. On the same or the following day, Kern saw one

Sherman, who had in previous years been the Vulcan scrap purchasing agent in Baltimore, and told him that if he could get options on scrap for a number of years Kern undoubtedly could arrange to have him appointed the purchasing agent for the Republic Company. As there was only a limited amount of this raw material available, it was very necessary for the Republic Company to get control of sufficient scrap and very detrimental to Kern's employer to have a rival company getting options on supplies from concerns that it might have to rely upon for its own supply. On January 18, 1912, the contract between Kern and Assmann was drawn and acknowledged January 22, 1912, providing for the organization of the Republic Company and Kern agreed to resign his position with the Vulcan Company on or about October 1, 1912, and " to use his best efforts to assist the proposed corporation in the purchase of scrap tin, and to give its officers the benfit of his advice and knowledge in connection with the business of the proposed corporation, for the period of three years from October 1, 1912." The Republic Company was at once incorporated and not a day was lost in its endeavor to hurry into the field in which the Vulcan had been so long experimenting. It is to be borne in mind, in considering what followed, that Kern successfully concealed from the Vulcan Company the fact that he was in any shape or form connected with the Republic Company until after he had left the company, and when his resignation was accepted on September 13, 1912, the plaintiff was so completely in ignorance of what had been going on that " The President was requested to notify Mr. Kern of the acceptance of his resignation and to express the regret of the Board on the severance of his relations with the company."

On January 19, 1912, Kern instituted a vigorous campaign to buy up tin scrap for the Republic Company while working for the Vulcan Company, and on that day wrote from the office of L. A. Norton, 25 Broad street, to the treasurer of the Mohawk Condensed Milk Company, inclosing a contract for tin scrap " such as we propose to make with you " for ten years from January 1, 1913. He took the precaution to tell him, in writing to him, to address him at Norton's office. Mohawk

scrap had been used in Vulcan run No. 5 and ran two and nine-tenths per cent tin, as compared with average scrap one and seventy-five one-hundredths per cent tin. The Mohawk people had always sold to the Vulcan. It is impossible without unduly extending this opinion to follow Kern's activities in securing for the Republic Company 30,000 tons of scrap while working in the pay of the Vulcan Company, which resulted in a scramble between the two companies and a consequent increase in the price that had to be paid for scrap. One of the worst features of all of this was Kern's getting the Baltimore market for scrap away from the Vulcan Company. This is attempted to be minimized by showing that there had been an agreement between the Vulcan Company and the Goldschmidts whereby the Vulcan Company was not to buy in the Baltimore market, but the fact is that with typical disregard for such "scraps of paper," Kern had secured for the Vulcan the 1912 output from Baltimore, which further emphasizes his disloyalty in getting the 1913 output for the Republic, while still in the employment of the plaintiff. In the latter part of January, 1912, Kern was in Pittsburg looking for a site for the Republic plant, which was shortly thereafter located there. Kern used a fictitious name while in Pittsburg. It may be that his reason for so doing as given by him, namely, that he did not wish the people with whom they were dealing to know that the property was to be used for a chlorine plant because they might object to it as a nuisance, was true, but in view of the testimony as to his using an assumed name on other occasions in dealing with people on behalf of the Republic while in the employ of the Vulcan Company (although this is denied by him) the fact is of some significance. About the middle of March, 1912, the defendant Schmaal was engaged as engineer in connection with the construction of the Republic plant, and in connection with engaging him Kern told Ayres, who had now become the Republic's vice-president, about the Vulcan-American Can Company suit, whereupon Ayres sent to Trenton for a copy of the decree, which he read. All this time detailed reports were being submitted by Carrier to Kern, showing the results of the various runs of the Vulcan Company, and on March 16, 1912, Carrier made a most important report in great detail

upon the matter of the chlorine supply and the use for this purpose of Warner chlorine cells. The Vulcan Company's plans were going forward rapidly and on March 21, 1912, Kern reported to the Vulcan board: " Our staff at the factory is occupied with the preparation of plans and specifications for the larger installation for chlorine detinning." On the same day Ayres wrote Schmaal to report at the Fuller Building in Jersey City, " that there would be some sketches for him to examine." On March 25, 1912, Schmaal went to work at the Fuller Building office; Kern had arranged for the room and reported it to Ayres. In the latter part of March, 1912, Kern suggested to Ayres that the Republic employ the Vulcan Company's chemical expert Whipple " to check up Schmaal." Kern sent Whipple to Ayres between March twentieth and March twenty-seventh, and Whipple was engaged and went to work for the Republic on March 26, 1912, when he was not only employed in a most confidential relation by the Vulcan Company but had been made thoroughly conversant with all of the Vulcan Company's experiments, its problems and the manner in which they had been worked out and with its plans for the installation of a big plant. It is true that Ayres told Whipple that he did not want " trade secrets of another company " or " secret processes," but it is perfectly obvious that he wanted the benefit of Whipple's experience with the Vulcan Company experiments and process to guide the Republic Company in setting up and making a success of a chlorine detinning plant, which, whether or not intended so to be, turned out to be, as the evidence now stands, a practical duplication of the Vulcan Company's plant. Whipple, of course, claims that he disclosed nothing whatever of a confidential nature to the Republic Company, and that he was entitled to work for more than one company and, indeed, had refused to make an exclusive contract with the Vulcan Company. Nevertheless, his contract expressly made all of his information and discoveries concerning chlorine detinning, with which he was not familiar when he went into plaintiff's employment, the property of the plaintiff, and he expressly agreed not to disclose any such information. It was impossible for him to advise the Republic Company how to install its process without in effect communicating to it and actually giving it the benefit of his discoveries made in the employment

of the plaintiff. It should be said in justice to him that he claims that he disclosed the Republic's offer to him to the Vulcan Company's president, Spiegelberg, and that the latter made no objection but rather encouraged him in so doing. This testimony stands undenied because Spiegelberg, who was present at the opening of the trial, was not present when this testimony was given and so could not contradict it, being then in California. But whatever may be said concerning Whipple's conduct in assisting the Republic Company to install this plant, there is nothing to be said in mitigation of Kern's conduct in suggesting him to Ayres " to check up Schmaal " who knew nothing whatever about the process of chlorine detinning.

It is not feasible in this opinion to outline the details of the simultaneous activities of Kern for his employer and its rival. Suffice it to say that the plaintiff's plans were completed as early as March 28, 1912, and the defendant's plans were not begun until March 25, 1912. The striking fact is not alone the similarity in the plans and installation, but that the Republic Company was able *without any experimentation* to decide at once on every essential feature of its plant, turn out the plans for them and let contracts within a few weeks of the letting of the Vulcan Company contracts. There is no explanation of this, and there can be none except that Kern turned over to the Republic Company full information concerning the plans, installation and process of his employer. For example, take so fundamental a matter as the huge horizontal cylinders in which the detinning was to be done. No one had ever attempted to employ such means for commercial detinning. The Goldschmidt cylinders were vertical and necessarily much smaller. All of the Von Kugelgen and Seward patents showed vertical cylinders. These great horizontal cylinders, which in the Vulcan Company plant were seventy-seven feet long and in the Republic plant sixty-four feet long, not only gave great capacity, but simplified and speeded up operation by enabling tracks to be laid into them on which the heavy baskets of scrap weighing several tons coupled together like cars in a train could be run in and out, and also facilitated the system of piping and circulation of gas; yet the Vulcan Company's cylinder

contracts, embodying three years' experiments, were let on April 15, 1912, and the Republic Company's plans were dated April 18, 1912, and the contract was given to the same concern that turned out the Vulcan cylinders on July 19, 1912. The Vulcan Company planned six cylinders; so did the Republic, but changed to seven on advice of Whipple and Kern on June 17, 1912. Both were equipped with rails, though at first the Republic used a system of rollers. The inside diameter of plaintiff's cylinders was eight feet ten inches; of the Republic's ten feet two inches. The cylinders of both were made of steel plates five-sixteenths of an inch thick. The length of each plate was six inches. The plates were similarly joined to allow free flow. Both had reinforced rings around the outside circumference, the Vulcan Company of four-inch by four-inch angle iron, the Republic three-inch by four-inch angle iron. In the center of each section, one to each six-foot section, there was a spacing of reinforcing rings. The Vulcan cylinder heads were two feet six inches long, the Republic two feet ten and one-half inches long. Both had head supporting brackets on each side, Republic of cast steel, Vulcan of cast iron. The covers or doors were cast iron rings with steel plate, dished thirteen inches in the case of Vulcan, and cast steel, dished thirteen inches in the case of the Republic. The Vulcan thickness of cover rings was one and one-fourth inches, Republic one and one-half inches. Each had a tongue around circumference to fit groove on the head, and each used packing in a groove on the face of the cylinder head. With reference to packing, Kern wrote Muench November 19, 1912: " Stick to those that are known and have been tried out. A defective packing will play the mischief and do any amount of damage."

The matter of chlorine gas supply in the process was vitally important. As we have seen, the process was made successful by Carrier's experimenting until he had carefully determined the rate of chlorine admission for a given quantity of tin scrap. In a commercial proposition, where the quantity of tin scrap that could be detinned in a given time was of first importance, obviously the matter of a regular, sustained and sufficient supply of chlorine with which to maintain the requisite rate of admission of gas to the cylinders was extremely important. While Von Kugelgen and Seward claimed to have

employed cells in producing the chlorine used in their experiments, it had never been attempted commercially. Carrier made a most elaborate investigation of the various cell systems and an analysis as to which kind of cell would be most economical, and he investigated the plants engaged in supplying cells and turned over all of this information to his employer, and incidentally to Kern, while Kern was projecting the Republic installation. Perhaps the Republic Company in the course of experimenting would have reached the same conclusion that Carrier did, and would have hit upon the Warner electrolytic cells of the diaphragm type for its chlorine gas supply; but unquestionably the Republic Company obtained its information from Kern that this was the best system to use in connection with the proposed process. Both companies contracted for 200 initial cells; both for an additional provision of 100 cells; both provided for a detinning capacity of seventy-five to eighty tons per day; and both paid the identical price, and, in addition, it was proved that the Vulcan's blueprints were used to Kern's knowledge by the Warner people in getting out the Republic's cell system. The Vulcan's Warner cell contract was dated May 22, 1912, and the Republic's July 12, 1912. The former was decided upon after years of experimentation and due consideration and investigation, the latter without any investigation whatever. It was a question either of inspiration or of appropriating the result of the plaintiff's investigations. It is not necessary in this opinion to describe all the similarities between these two installations. It may be said generally, however, that both companies not only employed the horizontal cylinders and the electrolytic cell method for supplying chlorine, but used tourills for drying chlorine gas and air, interposed condensors between the cells of the tourills, used Zaremba triple effect evaporators substantially identical in capacity, principle and size; similar rectangular kilns for drying the scrap, even to square flue openings under each basket; substantially similar baskets or boxes lined with perforated metal for conveying the scrap into the cylinders; the train load method for handling the baskets; two seven and one-half ton electric cranes for lifting the baskets; winches for hauling the baskets into and out of the kilns and cylinders; four tubs for washing the

detinned scrap in water and caustic solution; stills for dis-
tilling the tetra; plaintiff, one stoneware tower for condensing
the tetra fumes; the Republic, a system of scrubbing towers
in which was broken stoneware to absorb the tetra fumes
with the liquid; both used a caustic solution to clean the
scrap and remove paint therefrom before detinning (an
important matter determined by Carrier's experiments); and
both used hammers for billeting the detinned scrap, the
Republic's coming in a peculiar and roundabout way from
the Vulcan plant. It is quite true that counsel for the
Republic Company were able on cross-examination to bring
out a considerable number of differences in the plans and
some differences in the layout and application of these features
that were so similar, but it is undoubtedly true, as the evidence
now stands, that the installation of the two plants was sub-
stantially similar, so far as all fundamentals went. It is
quite true that any one was free to use the Warner cell
system as a chlorine supply, to use drying kilns, wash tubs,
Zaremba evaporators, horizontal cylinders with tracks laid in
them, and the like, but the point is that all the fundamentals
of plaintiff's installation which were either useful or necessary
to its success were discovered to be useful or necessary as a
result of plaintiff's experiments, and that the only manner in
which the Republic Company ascertained these facts was
through Kern's betrayal of his employer's confidence and using
this information to build and develop the Republic Company's
rival plant. It is not a case at all, where people experimenting
with the same process have naturally hit upon the same
methods of making it a success. If the Republic Company
had, as a result of its own experiments, decided that these
various accessories and devices, which constituted the com-
mercial plant, were useful or necessary, plaintiff would have
no cause of complaint. But that is not this case. The
Republic Company obtained this knowledge and information
not from experiment but through Kern's betrayal of his trust,
*while still in the employment of the plaintiff.* It is true that
there is no admission by Kern that he disclosed any infor-
mation to the Republic — in fact, he stoutly denied having
done so; and all of the defendants who were placed upon the
stand by the plaintiff asserted good faith and denied having

been parties or having received any disclosures, and there are no letters in which the disclosures are made; but the inference that the information came from Kern is irresistible.

Neither is this a case where one after leaving his employer uses for the benefit of a new employer knowledge acquired by him during his previous employment. As was said by SCOTT, J., in *Peerless Pattern Co.* v. *Pictorial Review Co.* (147 App. Div. 715, 717): " All that clearly appears is that he undertook to use in his new employment the knowledge he had acquired in the old. This, if it involves no breach of confidence, is not unlawful, for equity has no power to compel a man who changes employers to wipe clean the slate of his memory." But here was Kern, while still in the employ of the plaintiff, concealing his relation to the Republic Company, deceiving his employer into believing that he was devoting his best efforts to its own interests, and yet at that very time deciding for the Republic Company what installation it should put in and always deciding in favor of the methods shown by plaintiff's experiments to be the most feasible. After leaving plaintiff's employment, possibly Kern might have advised a new employer that as a result of his experience the Warner cell system, in combination with the brine supply and Zaremba evaporator system used by the plaintiff, was the most useful and perhaps the only feasible method of making this process a success; but while he was employed by the plaintiff, the plaintiff alone was entitled to that information. As was said by the Supreme Court of the United States in *Board of Trade* v. *Christie Grain & Stock Co.* (198 U. S. 236): " The plaintiff has the right to keep the work which it has done, or paid for doing, to itself. The fact that others might do similar work, if they might, does not authorize them to steal the plaintiff's. * *. * The plaintiff does not lose its rights by communicating the result to persons, even if many, in confidential relations to itself, under a contract not to make it public, and strangers to the trust will be restrained from getting at the knowledge by inducing a breach of trust and using knowledge obtained by such a breach." (See, also, *F. W. Dodge Co.* v. *Construction Information Co.*, 183 Mass. 62.) In this case, while Kern did not himself sign a secrecy contract, he required every one else to, and the evidence leaves no

room to doubt that he understood that the plaintiff regarded everything done in connection with developing this process as secret and required it to be kept secret. Kern's information concerning the development of this process was of the most confidential character. " Courts of equity will restrain a party from making a disclosure of secrets communicated to him in the course of a confidential employment. And it matters not, in such cases whether the secrets be secrets of trade, or secrets of title, or any other secrets of the party important to his interests." (2 Story Eq. Juris. [13th ed.] § 952.) As was said in the leading case of *Morison* v. *Moat* (21 L. J. [N. S.] Ch. 248): " There is no doubt whatever that where a party who has a secret in trade employs persons under a contract, express or implied, or under duty express or implied, those persons cannot gain the knowledge of that secret and then set it up against their employer." Neither processes of manufacture nor machinery nor machinery installation need be patentable to be protected as trade secrets. (*Eastman Kodak Co.* v. *Reichenbach*, 79 Hun, 183, 192; *Peabody* v. *Norfolk*, 98 Mass. 452, 458; *National Gum & Mica Co.* v. *Braendly*, 27 App. Div. 219, 225.) Kern was not only turning over to the Republic Company the results of plaintiff's experiments and its consequent decisions, as indubitably shown by the dates of the various plans and contracts, and the other circumstances hereinabove shown, while in plaintiff's employment, but, which makes the case even more aggravated, it was he who instigated and persuaded Assmann to form the Republic Company and set it up in business against the plaintiff. This certainly was far from living up to the rule in *Nichol* v. *Martyn* (2 Esp. 732), where it was said: " A servant while engaged in the service of his master has no right to do any act which may injure his trade, or undermine his business." Whether or not the plaintiff's process of detinning, in so far as it solved the problem of temperature control, was a secret process, within the ordinary meaning of that term, and whether or not it was covered or dominated by the Seward and Von Kugelgen patents, in my opinion the plaintiff was entitled, as it endeavored to do, to keep the knowledge of its peculiar methods of installation to itself, and that it is entitled to the aid of a court of equity to have its novel installation

First Department, December, 1918.          [Vol. 185.

protected as a trade secret. I am, therefore, led to the conclusion that, irrespective of the very technical questions involved as to identity of process, from a chemical point of view, the plaintiff made out a *prima facie* case which entitled it to an injunction restraining the operation of the Republic Company's chlorine detinning plant at Neville Island, Penn., and from employing there or elsewhere the novel method of installations devised and developed by the plaintiff, information concerning which was obtained by the Republic Company through the betrayal of confidential information by plaintiff's employee, Kern, while Kern was in plaintiff's employment.

Considering the *process* as separate from plaintiff's method of *installation*, a different situation is presented. Assuming, as we must, that the Von Kugelgen and Seward patents are valid, I am satisfied that the Special Term was entirely correct in deciding that, at the time when Kern left the employ of the plaintiff, the only chlorine detinning process which the plaintiff intended to use was a process which, at least in so far as the essential feature of temperature control was concerned, was covered by the Seward and Von Kugelgen patents and that the Republic Company in the operation of its plant uses a process covered by the same patents. It does not necessarily follow therefrom that the two processes are identical. Indeed, obscure as is much of the testimony on this important branch of the case, resulting from plaintiff's unwillingness to furnish a comprehensive description of its process, it is clear that there are differences in piping arrangement, involving important differences in the method of circulation of gas through the several cylinders, as a result of which the Vulcan, while operating a single cylinder or a pair of cylinders as a unit, is unable at the same time to operate the remaining cylinders as units either singly or in pairs, whereas the Republic cylinders, while connected in series, may all be operated at the same time as units. But, as has been pointed out, the fundamental principle of the process, apart from the methods of installation, however important they are, consists in temperature control. The plaintiff stoutly maintains, and its counsel ingeniously argues, that it does not maintain temperature control by any device or method which brings the process

within the broad claims of the Seward and Von Kugelgen patents. Yet the plaintiff's president, Buttfield, admitted that when the danger point is reached, the Vulcan reduces the rate of admission of chlorine, and he testified that one of the purposes of circulating the gases through the different cylinders is to control the temperature. Apparently realizing the danger of this admission, upon a later hearing Buttfield attempted to correct his testimony by saying that the Vulcan did not reduce the rate of admission of chlorine but shut the chlorine off. Whether the chlorine rate is reduced or whether the chlorine is temporarily shut off, it is clear that the Vulcan Company cannot depend merely upon a steady rate of the admission of chlorine, proportioned to the size of the baskets of scrap and the time required for detinning, and be confident that excessive heat will not develop and burn the iron. It has to avoid this danger by interfering with the rate of the admission of chlorine, and thus it gets its results through maintaining control of temperature by active means and falls within the claims of the Von Kugelgen and Seward patents. This cannot be explained away by anything in the record. The plaintiff was strangely reluctant to put upon the stand witnesses qualified to give a convincing and scientific account of the details of its process, but left it to the not very precise testimony of Buttfield. Carrier and Whipple, who of course knew the last details of plaintiff's process, were present in court during the trial and could have given valuable testimony on this head, and defendants' counsel strongly criticizes plaintiff's failure to put them on the stand. This criticism is hardly justified in view of the fact that the Republic Company had retained both of these men as its expert witnesses, which might well lead the plaintiff to hesitate to use them. But if it was possible for the plaintiff to prove that it did not employ the basic principle of temperature control, it is significant that it made no serious or convincing effort to do so. It is, therefore, unnecessary to enter further upon a consideration of the other technical similarities or dissimilarities in the chemical processes, apart from the installation, for it appears that the plaintiff's contention that it had devised a secret process of chlorine detinning which was not dependent for its success upon temperature control, and that Kern

betrayed this secret to the Republic Company, which was using it under the guise of operating under the Von Kugelgen and Seward patents, is unproved. But, for the reasons above pointed out, that does not at all warrant turning the plaintiff out of court.

There is one final feature of this case that requires consideration and that is the defendants' contention that the plaintiff is in any event disentitled to equitable relief because it has not come into court with clean hands. This is based upon the fact that the plaintiff, before filing the complaint, introduced a spy into the Republic Company's plant and thereafter certain changes were made in plaintiff's plant. Eldridge, an employee of the plaintiff, according to Buttfield, had told the latter that he had seen thermometers on the Republic's cylinders. (Eldridge testified to the contrary.) Thereafter the plaintiff substituted thermometers for thermocouples which had previously been used. Eldridge had seen the Republic Company's piping; after June, 1913, plaintiff made some changes in its piping and valves. The Republic Company, in addition to one fan on each cylinder to handle gases, had two additional fans, one of which was used to draw or push the stannic chloride fumes out of the cylinder; sometime after Eldridge's visit, the plaintiff added two blowers to its system, in addition to another required to serve an added cylinder. Eldridge admitted that, suggested by what he saw and reported, the plaintiff installed a device used for compressing scrap into baskets to be inserted into the cylinders.

While the sending of a spy into the Republic Company's works was entirely improper, it must be borne in mind that the plaintiff had good reason to know that the Republic Company had largely copied its installation from information divulged by plaintiff's employee Kern. It was necessary to establish this upon the trial, and the sending of a spy into the works for this purpose, and not for the purpose of copying the Republic Company's devices, was not such conduct as would warrant denying relief to the plaintiff. The only real appropriation of any idea established was the use of a box filled with iron to pack scrap. Originally the Republic Company's workmen stamped the scrap down with their feet; afterwards it used a concrete block. Eldridge got the idea,

from seeing a sand box, that a box filled with iron might be used to drop upon and pack scrap, and the plaintiff did use such a box. The Republic Company used neither a sand box nor a box filled with iron for that purpose. The matter is not one of vital importance, but, nevertheless, it is serious. If there were anything in the record to indicate that the plaintiff had sent a spy into the works of the Republic Company to obtain information for use in its business, we should not hesitate to deny any relief to the plaintiff; but there is no such evidence; and where it appears that a party has been as grievously wronged as the plaintiff has been, I do not think that this incident justifies a denial of all relief to plaintiff.

The plaintiff has asked that, if the judgment be reversed, this court shall grant appropriate relief, based upon findings to be made, without ordering a new trial, although the defendant has not put in its case excepting in so far as it developed upon the cross-examination. Plaintiff bases this upon the claim that defendants by asking for a dismissal on the merits at the close of plaintiff's case submitted the whole case to the court for a decision on the merits. (*Deeley* v. *Heintz*, 169 N. Y. 129, 133.) But I do not think we are warranted in applying any such rule in this case. The defendants cannot be said, under the circumstances of this case, to have submitted the case for final decision against them on the merits in the event that their motion was denied. That was not the understanding of the court when the motion was taken under advisement. The matter was discussed between counsel and the court at some length and the court stated: " The procedure will be this: If I deny the motion to dismiss the complaint, then the case will still be on for the defendants to put in their proof." Under these circumstances, I do not think it would be proper to grant judgment against the defendants in this court without any opportunity on the part of the defendants to develop their defense by means other than by cross-examination of plaintiff's witnesses. It is true that the defendants' case appears to have been very fully developed, owing to the fact that plaintiff relied upon calling the very witnesses on whom the defendants would naturally rely, but the interests of justice will be better served by ordering a new trial.

So far as the defendants Fred M. Assmann, F. P. Assmann and George O. Seward are concerned, the evidence is insufficient to warrant any judgment against them. Schmaal and Von Kugelgen were not served.

The action was discontinued before trial as against the Tin Products Company and Dorris Whipple. Accordingly, the judgment appealed from as to the defendants Fred M. Assmann, F. P. Assmann and George O. Seward should be affirmed, with costs, and as to the other defendants it should be reversed and a new trial ordered, with costs to appellant to abide the event.

CLARKE, P. J., LAUGHLIN, DOWLING and SMITH, JJ., concurred.

Judgment as to defendants Fred M. Assmann, F. P. Assmann and George O. Seward affirmed, with costs; as to other defendants, judgment reversed and new trial ordered, with costs to appellant to abide event. Order to be settled on notice.