# Van Products Company *v.* General Welding and Fabricating Company, Appellant.

250

Argued May 25, 1965.    Before BELL, C. J., MUS-
MANNO, JONES, COHEN, EAGEN and O'BRIEN, JJ.

*John G. Gent,* with him *James D. McDonald, Jr.,
Donald C. Winson, C. Arthur Wilson, Jr., B. D. Watts,*
and *Curtze, Gent & McCullough,* and *Eckert, Seamans
& Cherin,* and *Watts & Fisher,* for appellants.

*Will J. Schaaf,* with him *Stephen Jones, Charles
Lovercheck,* and *Marsh, Spaeder, Baur, Spaeder &
Schaaf,* and *Jones, Benson & Dwyer,* for appellee.

OPINION BY MR. JUSTICE EAGEN, October 13, 1965:
This is an appeal by General Welding and Fabricat-
ing Company (General) and Vincent Q. Rapp (Rapp)

(jointly referred to as appellants) from a final decree of the Court of Common Pleas of Erie County granting a permanent injunction against appellants, restraining them from making, advertising and selling deliquescent desiccant air driers, and directing that appellants account to Van Products Company (Van) for all profits realized from the previous sale of such air driers.

The historical background may be summarized as follows:

Van was organized in 1944, and engaged in the making of air vises. In 1951, it was contacted by O. Clair Norton, who claimed to have invented a unique air drier that could be used profitably in many areas of industry and manufacturing to prevent and eliminate fouling, rusting and shortened life in tools and machinery operated by compressed air. Norton's brain child, following years of experimentation, was a deliquescent desiccant air drier. A desiccant is a substance which attracts and holds moisture; to deliquesce means to become liquid-like. Norton's idea was to channel the compressed air through a chemical mixture which would absorb the moisture in the compressed air lines and deliquesce in an orderly fashion. Only the chemical had to be replaced. This type of device was a substantial improvement over the expensive and cumbersome driers then in general use, which required regeneration and the use of alternate driers. The chemical compound used, to be known as "Dryolite", was in the form of a pellet consisting of 93 per cent sodium chloride impregnated with a small quantity of calcium chloride and sodium dichromate.

On June 23, 1953, the United States Patent Office issued a patent to Norton for the drier. These rights were then assigned to Van for the purpose of further development and for the sale of deliquescent desiccant air driers. In August 1957, Norton applied for a pat-

ent on the desiccant used in the drier. This was never issued.[1]

On September 1, 1953, Rapp was employed by Van. He had no previous experience in this field, and, at first, his duties involved handling Van's mail operation. As the development and sale of the air driers grew in volume and importance in the Van system, Rapp's position of importance and value increased, so that eventually he ran the gamut of tasks involved in this segment of Van's business to become the general manager of the entire operation. During the course of this employment, he was intimately involved with purchasing, selling, advertising, plan and blue prints drafting, training and conducting field experiments to overcome customer difficulties. In short, Rapp was thoroughly imbued, through his industrious application, with all the problems, processes and advantages involved in the production, sale, and maintenance of this type of drier. He learned everything there was to know about Van's drier, except the composition of the desiccant itself.

Beginning in 1952, General began to make, engineer and design parts for Van's drier; then from September, 1953, to February 1, 1958, General manufactured the entire drier on behalf of Van according to Norton's patent. It was in this connection that General and Rapp were introduced. Because of the complicated nature of the construction of these devices and the intimate knowledge of these matters possessed by Rapp, he began frequent visits to General to supervise construction. Then on February 1, 1958, suspecting that Rapp's loyalty lay more with General than with it, Van terminated Rapp's employment. One week later, Rapp was employed by General, and within days was actively planning the manufacture and sale of a

---

[1] It appears that the patent would have issued for the desiccant as constituted, but Norton kept insisting on broader rights.

deliquescent desiccant air drier on General's behalf. He broke down the secret of the composition of the chemical formula used in the Van drier. He substituted urea for sodium chloride which performed the same function. On April 1, 1958, General sold its first deliquescent desiccant air drier, which, while not an exact duplicate or physically similar to Van's, was practically identical in function and concept.

On September 6, 1960, the United States Patent Office granted Rapp a patent for his desiccant. On March 16, 1965, Letters Patent were granted to Rapp and General for their drier.

On September 5, 1958, Van instituted this action for injunctive relief and an accounting. After prolonged hearings, the chancellor entered a decree in favor of Van. The court en banc subsequently made the decree final. This appeal followed.

The initial question for determination is whether or not the lower court had jurisdiction of the cause of action. Appellants strongly maintain that the issue basically involves patent rights, and that the decree of the lower court in effect deprives them of utilization of such rights and invalidates patents which they received. In short, they maintain that this is strictly "a patent case", and, therefore, exclusive jurisdiction is in the federal courts.

It is established beyond question that the district courts of the United States have exclusive, original jurisdiction of all civil actions arising under the patent laws: 28 U.S.C. §1338(a). See also, *Sears, Roebuck & Co. v. Stiffel Co.*, 376 U.S. 225 (1964), and *Compco Corp. v. Day-Brite Lighting, Inc.*, 376 U.S. 234 (1964). As recognized by this Court in *Slemmer's Appeal*, 58 Pa. 155 (1868), if the validity of a patent or patentability is the principal issue involved, then the jurisdiction of the federal courts is exclusive.

However, it is our considered conclusion that patent rights are only indirectly involved and that, under the circumstances, jurisdiction is properly in the courts of this Commonwealth.

The gravamen of the action is the abuse of confidence by Rapp who, as a trusted employee, allegedly misappropriated secret information of Van and used it to produce and market a competing product manufactured by General. That the state courts have the power to enjoin the use of a trade secret in a proper case, there can be no doubt. See, *Carl A. Colteryahn Dairy, Inc. v. Schneider Dairy*, 415 Pa. 276, 203 A. 2d 469 (1964), and *Macbeth-Evans Glass Co. v. Schnelbach*, 239 Pa. 76, 86 A. 688 (1913). And while patent laws may be involved, if they are purely incidental and collateral to the main issue of the case, and if jurisdiction exists over the parties and the subject matter in all other respects, our courts are not precluded from acting under their general equity powers: *Quaker State Oil Refining Co. v. Talbot*, 322 Pa. 155, 185 A. 586 (1936). See also, *Becher v. Contoure Laboratories, Inc.*, 279 U.S. 388 (1929); *Pratt v. Paris Gas Light & Coke Company*, 168 U.S. 255 (1897); *Hyde Corp. v. Huffines*, 158 Tex. 566, 314 S.W. 2d 763 (1958); *Bert Lane Co., Inc. v. International Industries, Inc.*, 84 So. 2d 5 (Fla. 1955); *H. J. Heinz v. Superior Court Alameda County*, 42 Cal. 2d 164, 266 P. 2d 5 (1954); *L. A. Young Spring & Wire Corp. v. Falls*, 293 Mich. 602, 292 N.W. 498 (1940); Annot., 170 A.L.R. 449, 495 (1947); and, 3 Robinson, Patents §858 (1890).

This, in our opinion, is such a case. The pivotal and main issue here presented is whether or not the appellants caused damage to Van's business through the use of confidential material misappropriated by Rapp while he was in its employ.

Moreover, appellants' jurisdictional contention seems to be based upon a misconception of the nature

of a patent monopoly, i.e., that, in being issued Letters Patent, a patentee is thus granted an exclusive right to use and exploit his invention. In fact, the patent monopoly is a negative right. 35 U.S.C. §154 provides that a patentee has "the right to exclude others from making, using, or selling the invention throughout the United States. . . ."[2]

The right to make, use or sell, though a logical corollary, is dependent upon natural or common law. See, *Bendix Aviation Corp. v. Kury,* 88 F. Supp. 243, 247 (E.D.N.Y. 1950), and authorities cited, supra note 2. The issuance of Letters Patent gives the patentee no more right to use his invention than he enjoyed before. See, Amdur, Patent Fundamentals, at 53 (1948). Therefore, viewed in this light, the existence of patent rights is not controlling. Infringement actions may be prosecuted in the federal courts, and existing patent rights may be unchallengable in a state court; however, appellants' right to manufacture and sell the drier involved depends upon how the knowledge in connection therewith was obtained. This is the issue here. It is not a "patent case".

We now come to the merits of the case.

In its adjudication, the trial court made certain findings of fact, including the following:

"13. General got direct from Van through Rapp the 'know-how' of the manufacture, operation and functioning of Van's deliquescent desiccant air drier and from no other source.

---

[2] See, *Patterson v. Kentucky,* 97 U.S. 501 (1878) ; *Little ` Mule Corp. v. Lug All Co.,* 254 F. 2d 268 (5th Cir. 1958) ; *Talbot v. Quaker-State Oil Refining Co.,* 104 F. 2d 967 (3d Cir. 1939) ; Annot., 170 A.L.R. 449, 454 (1947) ; Ellis, Trade Secrets §140 (1953) ; 3 Robinson, Patents §848 (1890). Cf. *Woodbridge v. United States,* 263 U.S. 50 (1923) (dictum to the effect that the grant is the right to make, use or sell, rather than the right to exclude others from so doing).

"14. Defendant Rapp wrongfully appropriated to his own use and that of Defendant, General Welding, the following trade secrets and confidential information and ideas:

"A. The idea and the original concept of the deliquescent type of air drier.

"B. The intimate knowledge of the need, use and demand for deliquescent desiccant air driers; namely, that this was a 'hot product'.

"C. Information derived from building up and maintaining intimate card files on customers and their peculiar problems and needs, and in servicing such customers.

"D. Van Products' know-how in manufacturing of these driers which it only achieved after years of success and failure, mistakes and corrections, testing and retesting, field testing, experimentation, study and analysis of problems in actual operation.

"E. Van Products' know-how in selling, which was an evolutionary process of direct-mail and finally to distributors and direct company contacts.

"F. Van Products material sources and costs.

"G. Results of and intimate knowledge concerning Van Products' research and development and experimentation in the field, dew point testing, analysis of ratios of the parts involved and the solved mechanical problems contained in their blueprints.

"H. Van Products' labor costs.

"I. The secret of the desiccant, namely, the impregnation of a soluble pellet holding material with other hydroscopic materials.

"J. Van Products' suppliers and accounts payable.

"K. Van Products' customers and accounts receivable.

"L. Mechanical secrets of the Van drier involving peculiar knowledge of design, material, dimensions and

positioning of baffles, orifices, screens, and supports other than those disclosed in sales literature or patents or otherwise in the public domain.

"M. Van Products' advertising methods and material.

"15. The misappropriation and use of said trade secrets, confidential information and ideas thus enumerated gave the Defendants an opportunity to achieve a competitive position in a field otherwise devoid of competition and thus to gain an unconscionable advantage and thereby become unjustly enriched at the expense of Plaintiffs."

These findings are further amplified (or condensed, as the case may be) in the court's "Discussion": "The trade secret hereinvolved . . . is all embracing rather than confined to any one particular item . . . or to any particular phase of its functioning. . . . It is not any one of these features or any others which constitute the trade secret contended for by Van but rather the whole picture combining the original idea or theory as worked up mechanically by Van into a tangible and marketable product and the know-how all along the line. . . ."

It is fundamental that the findings of fact of a chancellor which are approved by the court en banc have the weight of a jury's verdict, and will not be disturbed on appeal if there is adequate evidence in the record to sustain the findings: *St. Andrew's Evangelical Lutheran Church v. Lower Providence Township*, 414 Pa. 40, 198 A. 2d 860 (1964). On the other hand, it is equally well established that the chancellor's conclusions, whether of law or fact, being no more than his reasoning from the underlying facts, are reviewable: *Hoffman v. Rittenhouse*, 413 Pa. 587, 198 A. 2d 543 (1964).

It is our considered judgment that the lower court erred in concluding that the facts established a misap-

propriation of a legally protectible trade secret. The decree, therefore, must be reversed.

As noted before, Van prosecuted this action upon the theory that Rapp, as a trusted employee, learned of these secrets while in a confidential relationship, to wit, employee-employer, and misappropriated and used them after the termination of his employment with Van for the benefit and with the consent and knowledge of General.[3]

The concept of trade secret is at best a nebulous one and has been variously defined by case and text authority. Restatement, Torts, §757, comment b, states that "a trade secret may consist of any formula, pat-

---

[3] Restatement, Torts, §757, provides, i.a., that "one who discloses or uses another's trade secret, without a privilege to do so, is liable to the other if (a) he discovered the secret by improper means, or (b) his disclosure or use constitutes a breach of confidence reposed in him by the other in disclosing the secret to him. . . ." This Court has long recognized such a right in the employer: see, e.g., *Robinson Electronic Supervisory Co., Inc. v. Johnson*, 397 Pa. 268, 154 A. 2d 494 (1959); *Morgan's Home Equipment Corp. v. Martucci*, 390 Pa. 618, 136 A. 2d 838 (1957); *Belmont Laboratories, Inc. v. Heist*, 300 Pa. 542, 151 A. 15 (1930); and, *Macbeth-Evans Glass Co. v. Schnelbach*, 239 Pa. 76, 86 A. 688 (1913). The right is also recognized generally in other jurisdictions: see, e.g., *E. I. DuPont de Nemours Powder Co. v. Masland*, 244 U.S. 100 (1917); *Aktiebolaget Bofors v. United States*, 194 F. 2d 145 (D.C. Cir. 1951); *Furr's, Inc. v. United Specialty Advertising Co.*, 385 S.W. 2d 456 (Tex. 1964); *Hyman & Co. v. Velsicol Corp.*, 123 Colo. 563, 233 P. 2d 977 (1951); *Junker v. Plummer*, 320 Mass. 76, 67 N.E. 2d 667 (1946); and *Extrin Foods, Inc. v. Leighton*, 115 N.Y.S. 2d 429 (S. Ct. 1952). See also, Restatement 2d, Agency, §395; Annot., 165 A.L.R. 1453 (1946); Notes, Protection and Use of Trade Secrets, 64 Harv. L. Rev. 976 (1951); 1 Callmann, Unfair Competition and Trade Marks (Trade Secrets at 644, §51 et seq.) §55.1 (1945); McClain, Jr., Injunctive Relief Against Employees Using Confidential Information, 23 Ky. L. J. 248 (1935); Notes, Master and Servant—Equity—Protection of Information in the Nature of Trade Secrets, 14 Minn. L. Rev. 546 (1930); and, Hannigan, The Implied Obligation of an Employee, 77 U. Pa. L. Rev. 970 (1929).

tern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it."[4] The prerequisites to recovery upon a cause of action alleging misappropriation of trade secrets was long ago set forth for Pennsylvania in *Macbeth-Evans Glass Co. v. Schnelbach,* supra, 239 Pa. at 87, 86 A. at 691: "To be entitled to equitable relief the burden was on [the employer] to show; (1) that there was a trade secret, or, as in the case at bar, a secret process of manufacture; (2) that it was of value to the employer and important in the conduct of his business; (3) that by reason of discovery or ownership the employer had the right to the use and enjoyment of the secret; and, (4) that the secret was communicated to [the employee] while he was employed in a position of trust and confidence under such circumstances as to make it inequitable and unjust for him to disclose it to others, or to make use of it himself, to the prejudice of his employer."[5]

---

[4] This definition, according to the particular authority involved, is either too broad or too restrictive, but in general it seems to represent the consensus. Compare the definition in Notes, 14 Minn. L. Rev. 543, 548, supra note 3 (*"any* information of *peculiar* value to its owner, not protected by patent, and not generally known or accessible to everyone." [Footnotes omitted. Emphasis in original.]), with that approved in *Progress Laundry Co. v. Hamilton,* 208 Ky. 348, 349, 270 S.W. 834, 835 (1925) (" 'a trade secret is a plan or process, tool, mechanism, or compound, known only to its owner and those of his employes to whom it is necessary to confide it.' ").

[5] See also, *Wexler v. Greenberg,* 399 Pa. 569, 160 A. 2d 430 (1960) ; *Pittsburgh Cut Wire Co. v. Sufrin,* 350 Pa. 31, 38 A. 2d 33 (1944) ; and, Ellis, Trade Secrets §236. Cf. *Great Lakes Carbon Corp. v. Continental Oil Co.,* 219 F. Supp. 468, 498 (W.D. La. 1963), quoting from *Kinnear-Weed Corp. v. Humble Oil & Refining Co.,* 150 F. Supp. 143, 159 (E.D. Tex. 1956), aff'd 259 F. 2d 398 (5th Cir. 1958) : "The essential elements of a cause of action for breach of confidence are (i) possession by the plaintiff of knowledge or information which is not generally known, (ii) communication . . .

The opinion of the court below renders the decision of this case quite difficult by stating that the "trade secret" here involved is "all embracing" and "the whole picture". One rather salient point runs steadfastly throughout decisions in this area in most jurisdictions, and that is that the employee, upon terminating his employment relationship with his employer, is entitled to take with him "the experience, knowledge, memory, and skill, which he gained while there employed. . . . A man's aptitude, his skill, his dexterity, his manual and mental ability, and such other subjective knowledge as he obtains while in the course of his employment, are not the property of his employer and the right to use and expand these powers remains his property unless curtailed through some restrictive covenant entered into with the employer: Williston on Contracts, §1646, p. 4627." *Pittsburgh Cut Wire Co. v. Sufrin,* supra note 5, 350 Pa. at 34-35, 38 A. 2d at 34-35.[6] There is no restrictive covenant involved in the present case.

*Levine v. E. A. Johnson & Co.,* 107 Cal. App. 2d 322, 237 P. 2d 309 (1951), is interestingly parallel to the instant case. There the employee left his high position

by the plaintiff to the defendant under an express or implied agreement limiting its use or disclosure by the defendant, and (iii) use or disclosure by the defendant . . ., to the injury of plaintiff."

[6] See also, *Carl A. Colteryahn Dairy, Inc. v. Schneider Dairy,* 415 Pa. 276, 203 A. 2d 469 (1964) ; *Spring Steels, Inc. v. Molloy,* 400 Pa. 354, 162 A. 2d 370 (1960) ; *Wexler v. Greenberg,* supra note 5; *Bickley v. Frutchey Bean Co.,* 173 F. Supp. 516 (E.D. Mich. 1959), aff'd on opinion below, 279 F. 2d 685 (6th Cir. 1960) ; *Tempo Instrument, Inc. v. Logitek, Inc.,* 229 F. Supp. 1 (E.D. N.Y. 1964) ; *L. M. Rabinowitz & Co., Inc. v. Dasher,* 82 N.Y.S. 2d 431 (S. Ct. 1948) ; *Fairchild Engine & Airplane Corp. v. Cox,* 50 N.Y.S. 2d 643 (S. Ct. 1944) ; 1 Callmann, Unfair Competition and Trade Marks, supra note 3, §55.2(a) ; Hannigan, The Implied Obligation of an Employee, 77 U. Pa. L. Rev. 970, 972 (1929) ; and, Restatement 2d, Agency §396(b).

with plaintiff after 35 years of service in the field of constructing wooden tanks and cooling towers. Immediately thereafter, in partnership with his son, he went into competition with his former employer, who sought an injunction to restrain the use of trade secrets. Failing to find any real trade secrets, the court refused an injunction, saying that the former employee had built up a wealth of experience and skill during his employment and that to deny him the right to exploit it would wipe out his means of livelihood. No doubt the employee there was just as thoroughly embued with the intricacies and "secrets" of his employer's business as was Rapp here. The question still remains to be answered whether the information is such here that we must act as a judicial eraser to blot out Rapp's knowledge and skill.

Certain of the elements of the "trade secret" enunciated by the trial judge in Paragraph 14 of his opinion certainly fall within this category of "general knowledge, skill and experience" and are not thus proper subjects for a mental purge. For instance, 14B: "the intimate knowledge of the need, use and demand" for this product could not be a trade secret. It is something that would be learned in any productive industry, as are the "material sources and costs" (14F), "labor costs" (14H), the "suppliers and accounts payable" (14J), "customers and accounts receivable" (14K), and "advertising methods and material" (14M).

A further extension of this concept of "general knowledge" includes the little nuances and refinements developed by Rapp himself while not engaged in specific product research. For instance, 14E: the "know-how in selling, . . . an evolutionary process of direct-mail" was a process that Rapp was hired to conduct and of which he made a viable selling process. 14G: "results of . . . research and development and experimentation in the field . . . [etc.]" would not seem, upon

considered analysis, to be trade secrets in this case, and even if they were Van could not prove exclusive ownership since Rapp was the experimenter and tester. At most, Van can claim co-authorship on the basis that Rapp was paid to do this work; but much of the initiative and creative questioning was the product of Rapp's own ambition.[7] It would seem, then, that this generalized knowledge in the field of deliquescent dessicant air driers was a labor asset which Rapp was privileged to carry with him to his new employer. Perhaps the fact that this was a new and unique field might tend to persuade that these were secrets, but they are matters which any industrious person would learn in a developing field in Rapp's position. They are not of such character as to be classified as trade secrets.

Customer information such as that embraced in item 14C has been the subject of varied litigation. It is clear that this jurisdiction affords protection to an employer's confidential customer information: *Morgan's Home Equipment Corp. v. Martucci,* 390 Pa. 618, 136 A. 2d 838 (1957). Cf. *Carl A. Colteryahn Dairy, Inc. v. Schneider Dairy,* supra. And, as pointed out in *Morgan's Home Equipment Corp.,* a distinction often drawn in the cases to the effect that an injunction will not issue unless an actual physical list has been taken (as opposed to a list carried away in the employee's memory)[8] is not really meaningful, being based upon the

---

[7] See, Bishop, Jr., Employers, Employees, and Inventions, 31 S. Cal. L. Rev. 38 (1957), and Notes, Protection and Use of Trade Secrets, 64 Harv. L. Rev. 976 (1951). Cf. *Wellington Print Works, Inc. v. Magid,* 242 F. Supp. 614 (E.D. Pa. 1965). But cf. *B. F. Gladding & Co., Inc. v. Scientific Anglers, Inc.,* 245 F. 2d 722 (6th Cir. 1957).

[8] *Progress Laundry Co. v. Hamilton,* supra note 4; *Sarkes Tarzian, Inc. v. Audio Devices, Inc.,* 166 F. Supp. 250 (S.D. Cal. 1958) ; *Richard M. Krause, Inc. v. Gardner,* 99 N.Y.S. 2d 592 (S. Ct. 1950) ; and, Nims, Unfair Competition and Trade Marks [Trade Secrets, Ch. XI at 401, §141 et seq.] §157 (3d ed. 1929).

manner of taking, rather than the character of the information taken.[9] Nor is the fact that it was the employee himself who compiled the list.[10] As with any other trade secret, for customer information to be protectible it must be a particular secret of the business, of value to the employer and wrongfully appropriated by the employee. In the present case, the actual lists were merely distillations of commercial lists created from the very general knowledge that users of compressed air are potential customers for air driers. In this respect, these customer lists are in no way secret: *Denawetz v. Milch,* 407 Pa. 115, 178 A. 2d 701 (1962). The further assertion is that extensive data was also stored in an elaborate card-file system (a system devised and set up by Rapp). This data was accumulated by Rapp during his field trips and from experimentation designed to meet customer requests and problems. We are convinced that Van has failed to show that this information was any more than the recorded results of Rapp's acquisition of general knowledge and skill in this field.

The key to the lower court's thinking seems to be contained in Paragraph 14D: "know-how in manufacturing . . . which [Van] only achieved after years of success and failure, mistakes and corrections . . . [etc.]."[11] Along with "trade secret", the concept of "know-how" is also a very fuzzily defined area, used primarily as a short-hand device for stating the conclusion that a process is protectible. It covers a multitude of matters,

---

[9] McClain, Jr., Injunctive Relief Against Employees Using Confidential Information, 23 Ky. L. J. 248 (1935), and Ellis, Trade Secrets §§71, 72 74 & 79 (1953).

[10] Ellis, Trade Secrets §75.

[11] With this, compare the statement in Ellis, Trade Secrets §211, to the effect that there are no property rights in the knowledge of mistakes to be avoided, citing *Detachable Bit Co. v. Timken Roller Bearing Co.,* 133 F. 2d 632 (6th Cir. 1943).

however, which in the broad sense are not protectible, e.g., an employee's general knowledge and skill. A manufacturing company is merely the sum of its producing units, including the skills of its employees. Granted that Van had a very precise knowledge of the field of air driers, but it was mainly derived from Norton's inventiveness and Rapp's industrious experimentation. We think that, in the present case, Van's "know-how" was not protectible from exploitation by Rapp.

Paragraphs 14A and L: "The idea and the original concept" and the "mechanical secrets of the Van drier" present a question which has produced a conflict of authority among the jurisdictions: to wit, whether prior public disclosure is permitted to be raised as a defense by a defendant charged with violating a confidence in business.[12]

In the first place, the "idea and original concept" of a deliquescent desiccant air drier was conceived by Norton many years ago, and was finally patented by him in 1953, prior to the time Rapp began to work for Van. 35 U.S.C. §112 provides that "the specification [required to be appended to a patent application] shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains . . . to make and use the same . . . ." The result of this sec-

---

[12] Compare the implication of the statement in *Carver v. Harr*, 132 N.J. Eq. 207, 209, 27 A. 2d 895, 897 (Ch. 1942): "If defendants were originally under an implied obligation not to use complainants' invention for their own purposes, it was an obligation which ended when complainants, in seeking contracts, or by making deliveries, disclosed the design of their screens to a considerable number of persons.", with that in *Hyde Corp. v. Huffines*, 158 Tex. 566, 579, 314 S.W. 2d 763, 772 (1958): "Injunctive relief is not based upon the patent but the circumstance that the petitioner gained knowledge of such device at a time prior to its being patented through an abuse of a confidential relationship."

tion and the very nature of the patent publication have been consistently interpreted to work a destruction of any trade secret disclosed therein.[13] The inventor is put to his election; he can keep his secret hidden and run the risk of independent discovery by others, or he can disclose his secret to the world by Letters Patent and receive in return from the government a monopoly for 17 years.[14]

Further, these air driers were sold on the open market and described and covered extensively in the trade literature and Van's own advertising media. And there is considerable authority[15] to the effect that public sale

[13] *Bickley v. Frutchey Bean Co.*, supra note 6; *Kinnear-Weed Corp. v. Humble Oil & Refining Co.*, 150 F. Supp. 143 (E.D. Tex. 1956), aff'd 259 F. 2d 398 (5th Cir. 1958); *Darsyn Laboratories, Inc. v. Lenox Laboratories, Inc.*, 120 F. Supp. 42 (D.N.J. 1954), aff'd on opinion below, 217 F. 2d 648 (3d Cir. 1954); *Ferroline Corp. v. General Aniline & Film Corp.*, 207 F. 2d 912 (7th Cir. 1953); *Schreyer v. Casco Products Corp.*, 190 F. 2d 921 (2d Cir. 1951), cert. denied 342 U.S. 913 (1952); *Conmar Products Corp. v. Universal Slide Fastener Co., Inc.*, 172 F. 2d 150 (2d Cir. 1949); *Mycalex Corp. of America v. Pemco Corp.*, 159 F. 2d 907 (4th Cir. 1947); *Picard v. United Aircraft Corp.*, 128 F. 2d 632 (2d Cir. 1942); *Speaker v. Shaler Co.*, 87 F. 2d 985 (7th Cir. 1937); *Robine v. Apco, Inc.*, 227 F. Supp. 512 (S.D. N.Y. 1964); *Tempo Instrument, Inc. v. Logitek, Inc.*, supra note 6; *Great Lakes Carbon Corp. v. Continental Oil Co.*, 219 F. Supp. 468 (W.D. La. 1963); *Lyon v. General Motors Corp.*, 200 F. Supp. 89 (N.D. Ill. 1961); and, *Carter Products, Inc. v. Colgate-Palmolive Co.*, 130 F. Supp. 557 (D. Md. 1955).

[14] *Jessar Manufacturing Corp. v. Berlin*, 380 Pa. 453, 110 A. 2d 396 (1955); *Atlas Bradford Co. v. Tuboscope Co.*, 378 S.W. 2d 147 (Tex. Civ. App. 1964); Dunlavey, Protection of the Inventor Outside the Patent System, 43 Cal. L. Rev. 457 (1955); Annot., 170 A.L.R. 449 (1947); 1 Callmann, supra note 3, §53.3(b), and cases cited supra note 13.

[15] *Pittsburgh Cut Wire Co. v. Sufrin*, supra note 5; *Bickley v. Frutchey Bean Co.*, supra note 6; *Kinnear-Weed Corp. v. Humble Oil & Refining Co.*, supra note 13; *American Gage & Manufacturing Co. v. Maasdam*, 245 F. 2d 62 (6th Cir. 1957); *Baum v. Jones &*

of the article in question or the description thereof in literature available to the public will destroy any trade secret which the inventor might have had.[16]

As above noted, there is a split of authority upon the question of the effect of public disclosure (either prior or subsequent) of the matters alleged to be trade secrets through patent application and grant, descriptive literature, intentional disclosure, advertising and/or sale of the product embodying the secret.[17]

*Laughlin Supply Co.*, 233 F. 2d 865 (10th Cir. 1956); *Northup v. Reish*, 200 F. 2d 924 (7th Cir. 1953); *Mycalex Corp. of America v. Pemco Corp.*, supra note 13; *Sandlin v. Johnson*, 152 F. 2d 8 (8th Cir. 1945); *Great Lakes Carbon Corp. v. Continental Oil Co.*, supra note 13; *Houser v. Snap-on Tools Corp.*, 202 F. Supp. 181 (D. Md. 1962); *Titcomb v. Norton Co.*, 208 F. Supp. 9 (D. Conn. 1959); *Wissman v. Boucher*, 150 Tex. 326, 240 S.W. 2d 278 (1951); *Carver v. Harr*, 132 N.J. Eq. 207, 27 A. 2d 895 (Ch. 1942); Notes, Protection and Use of Trade Secrets, 64 Harv. L. Rev. 976 (1951); and, 3 Robinson, Patents §874 (1890). Cf. Sceales, Company Liability for Use of an Idea, 69 Dick. L. Rev. 245 (Spring 1965). Note, too, the implication of *Sears, Roebuck & Co. v. Stiffel Co.*, 376 U.S. 225 (1964); *Compco Corp. v. Day-Brite Lighting, Inc.*, 376 U.S. 234 (1964); and, *Angell Elevator Lock Co., Inc. v. Manning*, 205 N.E. 2d 245 (Mass. 1965), which refuse to sanction the exact copying of an unpatented article (absent a confusion of source of manufacture). The obvious implication is that a public sale obliterates any trade secret embodied in the particular article sold.

[16] It is true, however, that regardless of the fact that an article's individual components are part of the prior art or are ascertainable by inspection of sold articles, a secret may obtain in the composite or in the process of manufacture (providing, of course, that the process itself is a secret one). See, *Sun Dial Corp. v. Rideout*, 16 N.J. 252, 108 A. 2d 442 (1954), and *Tabor v. Hoffman*, 118 N.Y. 30, 23 N.E. 12 (1889). But, in the present case there was no claim, nor does it seem possible to make out one, that there was a secret in the process of manufacture of the air drier, nor could there be any part of the composition not "in the public domain", since the entire composition was discernible by inspection of the articles sold to the public.

[17] Compare authorities cited supra, notes 13 and 15 (public disclosure destroys secret), with *Franke v. Wiltschek*, 209 F. 2d 493

*Smith v. Dravo Corp.*, 203 F. 2d 369, 374 (7th Cir. 1953),[18] concluded that "Pennsylvania will not deny recovery merely because the design *could have* been obtained through inspection. Rather, the inquiry in that jurisdiction appears to be: How *did* defendant learn of plaintiffs' design?" (Emphasis in original.) In *Dravo,* the defendant was attempting to purchase plaintiffs' company, and in the course of negotiations received detailed plans, models and patent applications. Thereafter, defendant refused to buy and began competitive manufacture, which put plaintiffs out of business. The Seventh Circuit concluded, reversing the District Court's judgment for the defendant, that defendant did not obtain any of its information from the "publicity material" (which was general in nature) or from the some 100 articles (metal shipping containers) which had been publicly sold, but rather from the communications and negotiations consummated during the abortive attempt to effect a sale of the company. *Pressed Steel Car Co. v. Standard Steel Car Co.*, 210 Pa. 464, 60 A. 4 (1904), cited as authority by the *Dravo* court, is inapplicable to the present case, as it was to *Dravo,*

(2d Cir. 1953) (gross example of industrial espionage) ; *A. O. Smith Corp. v. Petroleum Iron Works Co. of Ohio*, 73 F. 2d 531 (1934), opinion modified and rehearing denied, 74 F. 2d 934 (6th Cir. 1935) ; *Shellmar Products Co. v. Allen-Qualley Co.*, 36 F. 2d 623 (7th Cir. 1929) ; *Kamin v. Kuhnau*, 232 Ore. 139, 374 P. 2d 912 (1962) ; *Hyde Corp. v. Huffines*, supra note 12; *K & G Tool & Service Co., Inc. v. GG Fishing Tool Service*, 158 Tex. 594, 314 S.W. 2d 782 (1958) ; *Adolph Gottscho, Inc. v. American Marking Corp.*, 18 N.J. 467, 114 A. 2d 438, cert. denied, 350 U.S. 834 (1955) ; *Vulcan Detinning Co. v. Assmann*, 185 App. Div. 399, 173 N.Y.S. 334 (1918) ; *Fairchild Engine & Airplane Corp. v. Cox*, supra note 6; Ellis, Trade Secrets §§25 & 65 (1953) ; and, McClain, Jr., Injunctive Relief Against Employees Using Confidential Information, 23 Ky. L.J. 248 (1935).

18 Ostensibly, following diversity of citizenship and conflicts of law principles, the Court of Appeals in this case applied Pennsylvania law to the facts.

for there the sole question was whether blueprints given by plaintiff's customers (who had received them from plaintiff initially) to defendant, plaintiff's competitor, in violation of a duty of confidence were required to be returned. No competition was enjoined. We feel that the authorities holding that public disclosures destroy plaintiff's right to maintain a cause of action to preserve his trade "secret" as against a competing former employee who has violated a duty of confidence are more sound in theory and practice than those continuing to look to the relationship of the parties as a basis for the action. While recognizing that limited publication and experimental usages are not incompatible with secrecy, we feel that the widespread publication and advertising in this case and the public sale of the air driers destroyed Van's right to maintain a cause of action upon a breach of duty not to disclose its "trade secrets". The starting point in every case of this sort is not whether there was a confidential relationship,[19] but whether, in fact, there was a trade secret to be misappropriated: *National Starch Products, Inc. v. Polymer Industries, Inc.*, 273 App. Div. 732, 79 N.Y.S. 2d 357 (1948).

One final item was listed by the court below as a trade secret (14I) : "The secret of the desiccant, namely, the impregnation of a soluble pellet holding material with other hydroscopic materials." However, this is in direct contradiction to the following discussion in the court's opinion : ". . . [A]t no time was the secret formula of Norton's desiccant . . . ever revealed to [Rapp]. 'This was a secret of the highest order . . . . [Rapp] never did secure [the exact chemical formula] . . . ." Printed record, pp. 1858a-1859a. Of course, the idea and the practical functioning of such a deliquescent desiccant could not be a secret, in itself, since the prod-

---

[19] *E. I. DuPont de Nemours Powder Co. v. Masland*, 244 U.S. 100 (1917).

uct was advertised, described, and sold on the open market. Its remarkable characteristics, vaunted in sales literature, were the exact factor which made the Van drier desirable (i.e., it was a desiccant which did not require regeneration). Therefore, it was only the composition which was secret, and remained so after Rapp's departure. It was only Rapp's industriousness which enabled him to come up with an acceptable formula for a desiccant to use in the drier which he was privileged to construct. And the United States Patent Office recognized his inventiveness by issuing him Letters Patent on his desiccant. Furthermore, the trial court did not rule upon the prayer to require assignment of the Rapp patent to Van, from which failure Van did not appeal. We therefore decline comment on the question.

We do not consider the result herein reached as harsh or out of tune with accepted commercial morality as it may, at first blush, appear. Van has either sold its secret to the public or has traded it, through its agent, Norton, to the public for a 17 year monopoly. We are statutorily[20] declared to be unqualified to determine whether General's drier is infringing upon Norton's patent, and any relief thereupon must come from the federal court system which has exclusive jurisdiction of such questions.

Decree reversed. Each party to pay own costs.

Mr. Chief Justice BELL dissents.

Mr. Justice ROBERTS took no part in the consideration or decision of this case.

---

CONCURRING OPINION BY MR. JUSTICE COHEN:

While I need not reach the merits of this litigation, I concur in and join with the majority of this Court in its determination and result.

---

[20] 28 U.S.C. §1338(a).

I have great difficulty in concluding from the evidence that there were trade secrets and that the plaintiff-appellee met the burden imposed upon it to maintain substantial secrecy in the protection of the alleged trade secrets.

But I need reach no conclusion on the merits be- cause I find that the lower court lacked jurisdiction to enjoin the appellants from making, manufacturing and selling their patented desiccant and dryer. Relief may not be granted in this case because of the inextricable involvement of the alleged trade secrets with plaintiff's and defendant's patents thereby creating a possibility of conflict between state concepts of unfair competition and the uniform application of the patent law and patent policy. This field has been occupied exclusively by the Federal Patent Law. Two recent landmark cases—*Sears, Roebuck & Co. v. Stiffel Co.*, 376 U.S. 225 (1964) and *Compco Corp. v. Day-Brite Lighting, Inc.*, 376 U.S. 234 (1964), clearly determine that the field has been preempted by the Federal Patent Law and that the state law of unfair competition is in conflict with the patent law and in the interest of uniformity and unburdened competition relief by way of damages or injunction based on the state law of unfair competition may not be allowed.

Were we to allow relief in this case we would be encroaching upon the Federal Patent Law and giving protection of a kind that clashes with the objectives of the law. Further, we would be doing these things under our state concept of unfair competition which the United States Supreme Court specifically said may not be done. We can neither extend the life of a patent nor have we the power to restrict its use even though the patent was obtained as a result of fraud and misrepresentation. Appellee recognized, as it did in its counter-statement of questions involved, that some aspects of the alleged secrets appropriated by appellants might be

the subject of a suit against appellants in the United States courts for infringement. The fact that the possibility of this federal action exists is sufficient to divest our state courts of jurisdiction and require that we stand aside so an action to rectify the alleged abuses may be pursued in the federal courts. I would require the lower court to acknowledge its lack of jurisdiction and dismiss the complaint.