# Judge Associates, Inc. v. Belcher

*Joseph D. Shein*, for plaintiff.
*Michael J. O'Donoghue*, for defendant.

ANDERSON, *J.*, January 16, 1975—

## HISTORY

On February 26, 1974, plaintiff, Judge Associates, Inc., filed a complaint in equity, praying for a preliminary injunction against defendant, Joseph J. Belcher, Jr., restraining him from competing in the employment agency business for a period of one year. A hearing on the petition was held before the Hon. Paul Ribner on March 8, 11 and 15, 1974. On August 6, 1974, Judge Ribner ordered that a preliminary injunction issue upon security being entered by plaintiff in the amount of $20,000, which security was entered on August 29, 1974. By the terms of the order, defendant was enjoined from communicating with employer clients of plaintiff; from engaging in or participating in the business of conducting an employment agency which was in competition with plaintiff; and defendant was directed to turn over to plaintiff all cases and files he might have had which were the property of plaintiff. The injunction was to be operative until December 17, 1974, and a further period equal to the amount of time from February 26, 1974, till August 6, 1974, and to be extended for any additional period of time during which defendant did not comply with the terms of the order.

On November 25 and 27, 1974, the issue of liability was tried before this court. Trial of the issue of plaintiff's damages and defendant's counterclaim for money due was deferred. On December 13, 1974, this court issued an order dissolving the preliminary injunction, and finding for defendant.

The following findings of fact and conclusions of law are pursuant to that order.

## FINDINGS OF FACT

1. Plaintiff is Judge Associates, Inc. ("Judge Associates"), a Pennsylvania corporation, with its principal place of business at 8040 Roosevelt Boulevard, Philadelphia, Pa. Plaintiff also has offices in Bala Cynwyd, Pa., and Ft. Washington, Pa.

2. The President of Judge Associates, Inc., is Martin E. Judge, Jr. ("Judge"), who resides at 261 Tareyton Court, Delran, N.J.

3. Defendant is Joseph J. Belcher, Jr., ("Belcher"), an individual who resides at 8323 Thouron Avenue, Philadelphia, Pa., and who trades as Belcher Personnel Consultants, with offices located at 8515 Germantown Avenue, Philadelphia, Pa.

4. Judge Associates has been continually in existence since 1970, and is an employment agency specializing in the placement of persons in positions with companies in the electronics, mechanical and technical fields.

5. Belcher is 27 years old, married, and has three children. He has a high school education and a few college credits.

6. From November 1969 to September 1971, Belcher was employed as an employment counselor with Main Line Personnel, another employment agency in the Philadelphia area specializing in the placement of persons in positions with companies in the electronics, mechanical and technical fields. His contract of employment with Main Line Personnel contained a covenant not to compete for a period of six months after termination of employment.

7. Belcher voluntarily terminated employment with Main Line Personnel and was employed as a

salesman for approximately nine months thereafter.

8. On July 10, 1972, Belcher signed an employment agreement with, and prepared by, Judge Associates, which was contemporaneous with his employment. Under the terms of the contract, Belcher's employment could be terminated by either party at any time.

9. Paragraphs 5, 6, and 7 of the contract provided that:

"5. The Employee shall devote his entire time, attention and energies to the business of the Employer, and shall not during the term of this Agreement be engaged in any other business activity whether or not such business activity is pursued for gain, profit, or other pecuniary advantage. . . . Specifically, Employee shall not during the term of this contract directly or indirectly engage in or be associated with any personnel consulting and employment agency business other than as an employee of Employer, nor shall Employee at any time directly or indirectly make known or divulge any information as to the JUDGE ASSOCIATES, INC. methods of operation, interviewing, advertising, publicity, training, business patrons or any other information relative to Employer's business.

"6. The Employee recognizes and acknowledges that the list of the Employer's clients, as it may exist from time to time, together with all written records applicable thereto, are valuable, special and unique assets of the Employer's business. The Employee will not, during or after the term of his employment, disclose the list of the Employer's customers, the written materials pertinent thereto, or

any part thereof to any person, firm, corporation, association, or other entity for any reason or purpose whatsoever. In the event of a breach or threatened breach by the Employee of the provisions of this paragraph, the Employer shall be entitled to an injunction restraining the Employee from disclosing, in whole or in part, the list of the Employer's customers, or from removing or otherwise appropriating any written records pertinent thereto, or from rendering any services to any person, firm, corporation, association, or other entity to whom such list, or such written materials, in whole or in part, have been disclosed or are threatened to be disclosed. Nothing herein shall be construed as prohibiting the Employer from pursuing any other remedies available to the Employer for such breach or threatened breach, including the recovery of money damages from the Employee.

"7. For a period of one (1) year after the termination of this Agreement by Employee, the Employee will not, within a radius of sixty (60) miles from the present place of business of the Employer, directly or indirectly, own, manage, operate, control, be employed by, participate in, or be connected in any manner with the ownership, management, operation, or control of any business similar to the type of business conducted by the Employer at the time of the termination of this Agreement."

10. The duties, scope and methods used by an employment counselor were essentially the same at both Main Line Personnel and Judge Associates, and Belcher utilized the experience and contacts that he had made at Main Line Personnel in the performance of his duties with Judge Associates.

11. Initially, pursuant to his employment as an employment counselor, Belcher compiled three-

by-five cards identifying potential employer and employe clients. His source of information was employment ads in the newspaper. The employer cards were to be kept permanently and listed the type of positions available with the firm and the individual in charge of personnel. Various trade digests and industrial guides were also used in the compilation of the cards.

12. By use of this "shotgun" approach, the successful counselor establishes contact with various potential employers or their personnel managers, the object being to develop steady accounts, which are the main source of the employment agency's income. These accounts may be exclusive, but most firms deal with several employment agencies simultaneously. The development of these steady accounts typically requires the expenditure of agency time and funds.

13. The agency's file card system would, therefore, include firms which are only potential customers as well as those which are steady clients.

14. Belcher worked as an employment counselor for Judge Associates from July to October 1972. In October 1972, Belcher was made manager of Judge Associates' new Bala Cynwyd office. He remained there until June 1973, when he was appointed manager of Judge Associates' Northeast Philadelphia office. In September 1973, Belcher was named a vice president of the company, in charge of "Executive Search," a new program to place personnel in higher salaried positions.

15. Belcher's work record was satisfactory at all times and he was considered a valued employe.

16. During the evening of December 11, 1973, a meeting of Judge Associate managers was held at Smiley's Restaurant in Philadelphia. Those present

at the meeting included Martin E. Judge, Jr., Joseph J. Belcher, Jr., Brian M. McGehean, and John J. Walsh.

17. At this meeting, among other things, the restrictive covenant in the Judge Associates contract was discussed, as it applied to one Roger Hammond, who had voluntarily terminated his employment with the agency.

18. Belcher expressed the opinion that if an employe was fired, the restrictive covenant was null and void.

19. Following the meeting, Belcher, McGehean and Walsh went to the Tollhouse Tavern, in Bethayres, Pa. Belcher told McGehean and Walsh that he had approximately $15,000, and intended to start his own employment agency in about six months time in the Ft. Washington, Pa., area. Belcher offered McGehean and Walsh a one-third interest in the business if they would invest $10,000 each. They were to be actively involved in the business.

20. On December 19, 1973, at the northeast office, Judge questioned McGehean about Belcher's plans. McGehean related to Judge the conversation that had occurred at the Tollhouse Tavern on December 11, 1973.

21. Judge then went to the Bala Cynwyd office and talked to Walsh. Walsh also related the conversation that had occurred at the Tollhouse Tavern on December 11, 1973.

22. Judge then met with Belcher in the presence of Michael A. Dunn, a Judge Associates employe. Judge confronted Belcher with the evidence he possessed indicating that Belcher intended to start his own agency.

23. Belcher denied any intention to work for

another agency, but did not specifically deny an intention to start his own business.

24. Judge told Belcher his employment was terminated, but left open the possibility of re-employment after the Christmas holidays.

25. Belcher was asked by Judge to relinquish his keys to the office and to the company car.

26. Belcher was driven home by Dunn. Belcher was upset, and indicated that he had put too much into the company to leave it at that time.

27. On December 20, 1973, Belcher returned to the Bala Cynwyd office, and removed a fishing rod and his wallet from the company car.

28. On December 26, 1973, Belcher again returned to the Bala Cynwyd office. Judge gave him his personal effects in a paper bag and reaffirmed his original decision that Belcher was fired. Belcher then asked Judge for back pay allegedly owed him.

29. Approximately two weeks later, Brian McGehean was cleaning out the car formerly used by Belcher. In the trunk he found four boxes of job orders and applications. Also in the trunk was fishing equipment belonging to Belcher.

30. Company policy known to all employes, including Belcher, prohibited the removal of any applications from the premises of Judge Personnel, and directed that evening or weekend recruitment be done in the office.

31. Other persons besides Belcher had access to the car, both before and after termination of his employment.

32. Belcher has no Judge Associates' files in his personal possession.

33. In January 1974, Belcher began making definite plans to set up his own agency, and on

February 18, 1974, received his employment agency license and on that date began dealing as Belcher Personnel Consultants.

## DISCUSSION

In Pennsylvania, contracts in restraint of trade are void as against public policy regardless of the valuableness of the consideration exchanged therefor. However, if the restraint is ancillary to the sale of a business or contract of employment, it may be permissible: Jacobson & Company, Inc. v. International Environment Corp., 427 Pa. 439, 235 A. 2d 612 (1967). Contracts of employment containing general covenants by an employe not to compete after the termination of his employment are prima facie enforceable if they are reasonably limited as to duration of time and geographical extent, that is, within such territory and during such time they must be reasonably necessary for the protection of the employer without imposing undue hardship on the employe: id. at page 452.

In Jacobson, the court upheld a restrictive covenant restraining the employe from engaging in, or being employed by a firm engaging in, the sale or installation of building materials for two years after termination of employment by the employe, in the eastern half of Pennsylvania, southern half of New Jersey and New Castle County, Del. The covenant contained in paragraph 7 of the contract in issue is only of one-year duration and covers an area of only 60 miles from the then present place of business of Judge Associates. The one-year time limitation is, on its face, not unreasonable. In view of the fact that Judge Associates has opened two new offices in areas suburban to Philadelphia, the 60-mile geographical limitation is likewise reasonable.

A contract similar to the one in question was before the Pennsylvania Supreme Court in Bettinger v. Carl Berke Assoc., Inc., 455 Pa. 100, 314 A. 2d 296 (1974). In that case, the court upheld the enforceability of a restrictive covenant in an employment contract promoting an employe to sales manager of the temporary placement division of the E. J. Bettinger Employment Service, a Philadelphia employment agency. The covenant enjoined the employe, Carl E. Berke, from working in the employment placement field for a period of one year after termination of his employment within 50 miles of the Philadelphia City Hall. The territorial limitation was later reduced by Bettinger to the Philadelphia city limits. In concluding that the covenant was reasonably necessary for the protection of the employer, the court relied on a factor that is equally applicable to the instant case: "the crucial importance of customer contact in the business": id. at page 104. Protection from competition of former employes is necessary because, in developing steady customers, the employe is required to maintain close affiliations with prospective employers: id. at page 104.

Likewise, as in Bettinger, in the instant case there was no showing that the enforcement of the restrictive covenant would work an undue hardship on Belcher. Not only was Belcher well aware of the existence of the covenant in his contract with Judge Associates, but he had previously been subject to a similar covenant pursuant to his employment with Main Line Personnel. After he left that job, he found employment as a salesman for almost nine months.

Moreover, the covenant in question has been interpreted by plaintiff only to prohibit Belcher from

being employed in a competing business. Belcher is not prohibited from engaging in the employment agency business, so long as he does not make placements in the electronics, mechanical and technical fields.

Because the covenant was contemporaneous with the employment contract and is in all respects reasonable, it is enforceable.

The difficulty in the instant case arises from the fact that the restrictive covenant on its face appears to be applicable only if the employe voluntarily terminates his employment.

In analyzing contracts, it is hornbook law that they are to be strictly construed against the maker: Jenkins Towel Service, Inc. v. Fidelity-Philadelphia Trust Co., 400 Pa. 98, 161 A. 2d 334 (1960). This is especially true of covenants not to compete, because they impose a handicap on the employe's ability to earn a living, and are a partial restraint upon the free exercise of trade: Hayes v. Altman, 438 Pa. 451, 266 A. 2d 269 (1970).

It is the conclusion of this court that Belcher was discharged from his employment by Judge. This court has no authority to redraft paragraph 7 of the employment contract to enlarge the terms of the covenant not to compete to include instances of termination by employer, in addition to termination by employe.

Plaintiff, however, contends that Belcher's activities just prior to termination amounted to willful misconduct for which Belcher knew, or should have known, he would be discharged. Plaintiff further contends that such conduct would, therefore, be tantamount to a constructive termination of employment by Belcher.

We agree with plaintiff that Belcher's conduct in soliciting Judge Associates' personnel to go into business with him, which would cause them to breach their respective covenants not to compete with Judge Associates, was willful misconduct for which he could be dismissed. However, plaintiff has cited no specific authority to support his contention that by such conduct Belcher constructively terminated his employment. The cases cited by plaintiff (Miles v. Metzger, 316 Pa. 211, 173 Atl. 285 (1934); Ritz v. Music, Inc., 189 Pa. Superior Ct. 106, 150 A. 2d 160 (1959); and Economy Grocery Stores Corp. v. McMenamy, 290 Mass. 414, 195 N.E. 747 (1935)), are not in point in that they merely support the proposition that if an employer discharges an employe without cause or otherwise breaches a contract of employment, the employer cannot enforce a covenant not to compete against the employe.

The general authority in the area does not support plaintiff's position. In MacFarland v. Unemployment Compensation Board, 158 Pa. Superior Ct. 418, 45 A. 2d 423 (1946), a worker employed as a fire watch and safety inspector was discharged as insubordinate after he made repeated, unwarranted complaints to superiors about safety equipment. Under the Unemployment Compensation Act of December 5, 1936, P.L. 2897, art. IV, sec. 402(b), repealed 43 P.S. §402 then in effect, an employe was entitled to compensation if he was discharged for any cause, but was not entitled to compensation if he voluntarily terminated his employment. In denying the appellant unemployment benefits, the board held that because the claimant could reasonably believe that his conduct

would result in dismissal, his resulting unemployment had to be deemed due to a voluntary leaving of work without good cause. In rejecting this conclusion, the Pennsylvania Superior Court said:

"The board's decision that a discharge under certain circumstances is equivalent to a voluntary relinquishment of employment is directly counter to our construction of the act. We have heretofore plainly held that the two are not the same thing, that one is the opposite of the other. 'When we say, "he left work voluntarily," we commonly mean, *he left of his own motion; he was not discharged. It is the opposite of a discharge*, dismissal or lay-off by the employer or other action by the employer severing relations with his employes, to provide against which the act was mainly designed': Labor and Industry Dept. v. Unemployment Compensation Board of Review, 133 Pa. Superior Ct. 518, 521, 3 A. 2d 211. (Italics supplied). That clear pronouncement must stand.": id. at page 422.

In Reading Aviation Service, Inc. v. Bertolet, 64 Berks 186 (C.P. 1972), affirmed 454 Pa. 488, 311 A. 2d 628 (1973), the court was confronted with a set of facts opposite to those in issue here. That case also involved a restrictive covenant applicable only if the employe voluntarily ceased employment. The employe left employment after his salary was reduced from $40,000 to $15,000 a year. The court rejected his contention that to uphold the covenant would create a "modern day peonage system," and concluded that he had "voluntarily" ceased to be employed.

Just as the need for financial security mandated a strict construction of the Unemployment Compensation Act of 1936 in MacFarland, covenants not to

compete must be strictly construed for the same reason. Therefore, it must be held that a discharge is the opposite of voluntary cessation of employment, regardless of the basis for the discharge. For this reason, the covenant not to compete contained in paragraph 7 of the July 10, 1972, contract between Judge Associates and Belcher must be interpreted with its literal terms.

Paragraph 6 of the contract, which is separate and distinct from paragraph 7, prohibits the disclosure of client lists and other written records relating thereto, during and after termination of employment.

The effect of this provision would be to prohibit Belcher from dealing with customers of Judge Associates, since he could not disclose their names to future employers or even to his own employes. Paragraph 6 is, therefore, another restrictive covenant in restraint of trade, and in order to be valid it must be reasonably limited as to duration of times and geographical extent, and must be reasonably necessary for the protection of the employer without imposing undue hardship on the employe: Jacobson & Company, Inc. v. International Environment Corp., supra.

Customer lists are proper subjects of covenants not to disclose. See Spring Steels, Inc. v. Molloy, 400 Pa. 354, 359, 162 A. 2d 370 (1960); Edwin L. Wiegand Co. v. Harold E. Trent Co., 122 F. 2d 920 (3d Cir., 1941), cert. denied 316 U. S. 667. However, paragraph 6 contains no time or geographical limitation. See 12 Am. Jur. 2d, Legal Forms §178.53. As will be discussed more fully infra, the customer lists in question are not so unique or critical to Judge Associates' business that they might be

entitled to indefinite protection. See Taylor Iron & Steel Co. v. Nichols, 73 N. J. Eq. 684, 69 Atl. 186 (1908); and 53 Am. Jur. 2d, Master and Servant, §104.

Under the facts in this case, the indefinite limitation contained in paragraph 6 is not reasonably necessary for the protection of Judge Associates' interests and is, therefore, void as an unreasonable restraint on trade.

Notwithstanding the above, in Pennsylvania, information learned by an employe during the course of his employment may be protected against disclosure, absent a specific contractual provision.

Generally, an employe, upon terminating his employment is permitted to take with him the experience, knowledge, memory and skill which he gained while employed: Van Products Co. v. General Welding & Fabricating Co., 419 Pa. 248, 260, 213 A. 2d 769, 30 A.L.R. 3d 612 (1965). However, when an employe by reason of a confidential relationship has acquired knowledge of trade secrets, he will not be permitted to make disclosure of those secrets to others to the prejudice of his employer: Macbeth-Evans Glass Co. v. Schnelbach, 239 Pa. 76, 86, 86 Atl. 688 (1913).

A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives one an opportunity to obtain an advantage over competitors who do not know or use it: Restatement, Torts, §757, comment b.

An employer's list of customers which is confidential may constitute a trade secret which is property and which is entitled to protection, independent of a nondisclosure clause in an employment contract, and it makes no difference whether the lists are written or carried away in the employe's

memory: Van Products Co. v. General Welding & Fabricating Co., supra, at page 262. This protection is afforded because in many businesses, permanent and exclusive relationships are established between customers and salesmen, and the compilation of a list of such customers represents a material investment of the employer's time and money: Morgan's Home Equipment Corp. v. Martucci, 390 Pa. 618, 623, 136 A. 2d 838 (1957). In Morgan, the employer company was engaged in the installment selling of household articles through door-to-door salesmen-collectors. Every salesman was given a confidential route. He visited the customers on his route on a regular and recurring basis, selling them goods and collecting from them weekly payments. On the basis of those facts, the court enjoined the disclosure and use of customer lists by salesmen who had left their employment.

We think that the facts of the instant case are more analogous to those in Van Products Co. v. General Welding & Fabricating Co. supra. In that case, an employe who had been employed for four years with a company which had developed and sold a unique type of air drier, was discharged for cause, and thereafter took employment with a competing firm and disclosed important information concerning the drier. In holding, inter alia, that certain customer lists were not trade secrets, the court said:

"In the present case, the actual lists were merely distillations of commercial lists created from the very general knowledge that users of compressed air are potential customers for air driers. In this respect, these customer lists are in no way secret . . . The further assertion is that extensive data was also stored in an elaborate card-file system . . . This data was accumulated by [the employee] during his

field trips and from experimentation designed to meet customer requests and problems. We are convinced that Van has failed to show that this information was any more than the recorded results of [the employee's] acquisition of general knowledge and skill in this field.": id. at page 263.

In the instant case, the employer clients who deal with Judge Associates do so on neither an exclusive nor a permanent basis. While it is true that it is important for the employment agency to develop steady accounts, and much time and money is spent in so doing, even those accounts frequently deal with several employment agencies at a time. Furthermore, the method used to get new accounts is simply to go to the newspapers, industrial guides and digests, which are readily available to the public at large, and place telephone calls to those firms doing business in the electronics, technical and mechanical fields.

Because the customer lists compiled at Judge Associates are not trade secrets, they are not entitled to judicial protection.

Accordingly, we enter the following

## CONCLUSIONS OF LAW

1. The covenant not to compete contained in paragraph 7 of the contract of employment entered into by Joseph J. Belcher, Jr. with Judge Associates, Inc., was contemporaneous with employment; was reasonable as to duration and geographical extent; and was reasonably necessary for the protection of Judge Associates without imposing undue hardship on defendant; and was thus enforceable by an action in equity.

2. The covenant not to compete was operable only if Belcher voluntarily terminated his employment.

3. Belcher was dismissed from his employment for good and sufficient cause. However, the covenant was not enforceable against him, because he did not voluntarily terminate his employment.

4. The covenant not to disclose the list of the employer's clients together with all written records applicable thereto, contained in paragraph 6 of the contract of employment entered into by Joseph J. Belcher, Jr., with Judge Associates, Inc., was contemporaneous with employment, but was not reasonably limited as to duration, and was thus not reasonably necessary for the protection of Judge Associates. It is, therefore, an unreasonable restraint on trade and unenforceable in equity.

5. The customer lists, records and information learned by Belcher during his employment with Judge Associates, were not trade secrets, subject to protection against use or disclosure independent of the employment contract.

A trial on defendant's counterclaim shall be scheduled forthwith.

The prior order entered by this court on December 13, 1974, shall be considered a decree nisi.

The foregoing opinion shall be a decree nisi.